647 A.2d 405

**UNITED STATES GYPSUM COMPANY et al.**

v.

**MAYOR AND CITY COUNCIL OF BALTIMORE.**

No. 127, Sept. Term, 1992.

Court of Appeals of Maryland.

Sept. 12, 1994.

Peter Buscemi (Grace E. Speights, Morgan, Lewis & Bockius, all on brief), Washington, DC (George A. Nilson, Piper & Marbury, both on brief), Baltimore (John H. Lewis, Jr., Amelia C. Kittredge, Morgan, Lewis & Bockius, all on brief), Philadelphia, PA., for U.S. Gypsum Co.

Thomas F. McDonough (Royston, Mueller, McLean & Reid, both on brief), Towson, for Asbestospray Corp.

Peter W. Taliaferro (Robert J. Lynott, Thomas & Libowitz, P.A., all on brief), Baltimore, for appellant, Hampshire Industries, Inc.

Melvin J. Sykes (Carl E. Tuerk, Jr., Elizabeth J. Case, Cooper, Beckman & Tuerk; Neal M. Janey, City Sol., Otho M. Thompson, Deputy City Sol., all on brief), Baltimore (Stanley J. Levy, Jordan Fox, Levy, Phillips & Konigsberg, all on brief), New York City, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE,* CHASANOW, KARWACKI and BELL, JJ.

ELDRIDGE, Judge.

This appeal arises out of a products liability action brought in 1984 by the Mayor and City Council of Baltimore ("the City") in the Circuit Court for Baltimore City, against manufacturers, distributors and installers of asbestos-containing building materials. The City sought damages against, *inter alia*, manufacturer United States Gypsum Co., installer Hampshire Industries, Inc., and manufacturer/distributor Asbestospray Corp., for the cost of discovering, managing, rectifying the effects of, and removing asbestos-containing surface treatment products.[1] No personal injury damages were sought in the action.

---

* McAuliffe, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

1. Prior to trial, the circuit court, with the agreement of all parties, split the City's action into three separate proceedings according to product group. This appeal is from a judgment in the proceeding involving "Group I" surface treatment products. The Group I products included asbestos-containing acoustical plaster, decorative wall and ceiling plasters, acoustical ceiling tiles, and spray-on fireproofing, which were installed in various City schools, libraries, offices, and other buildings.

Except for United States Gypsum, Hampshire Industries, and Asbestospray, all other defendants named in the original complaint and amended complaint, and involved in the "Group I" proceeding, were

Trial began in the present Group I proceeding on January 9, 1992. On June 5, 1992, the jury returned special verdicts in favor of the plaintiff based on alternative theories of negligence, strict liability under § 402A of the Restatement (Second) of Torts,[2] and breach of implied and express warranties.[3] The jury decided that the City was entitled to compensatory damages from the three defendants totaling $17,208,807.14. Specifically, the jury awarded compensatory damages against Asbestospray in the amount of $8,333,183.81, against United States Gypsum in the amount of $8,161,637.22, and against Hampshire in the amount of $713,986.11. The amounts of these compensatory damages awards were identical under all theories of recovery relied on by the City.

Hampshire had cross-claimed for indemnity against United States Gypsum, and, pursuant to an agreement between the two parties, an order was entered for United States Gypsum to indemnify Hampshire in the amount of the judgment against Hampshire in the Group I proceeding. The jury additionally determined that punitive damages should be awarded against United States Gypsum in the amount of $4,000,000, and against Asbestospray in the amount of $2,000,000. On August 11, 1992, the circuit court issued an order directing the entry of a final judgment pursuant to Maryland Rule 2–602 for the Group I proceeding, and final judgment was entered.[4]

———

granted summary judgment or had settled with the City prior to or during the trial.

2. The strict liability and negligence theories were both based upon the alleged lack of adequate warnings in connection with the defendants' asbestos-containing products.

3. A cause of action for breach of express warranties was not submitted to the jury against Hampshire Industries, Inc. Rather, Hampshire was only held liable based on negligence, strict liability, and breach of implied warranties with respect to its installation of United States Gypsum asbestos products in four City buildings.

4. Md.Rule 2–602 provides in relevant part as follows:

"(a) **Generally.**—Except as provided in section (b) of this Rule, an order or other form of decision, however designated, that adjudicates

The defendants timely noted appeals to the Court of Special Appeals, and this Court issued a writ of certiorari prior to consideration of the case by the intermediate appellate court. Shortly thereafter, the three defendants filed motions in this Court to "vacate" the circuit court's order directing the entry of final judgment pursuant to Rule 2–602, arguing that the trial judge abused "his Rule 2–602(b) discretion." Finding no abuse of discretion, this Court on March 18, 1993, denied the motions to vacate. Subsequent to briefing and oral argument in this Court, United States Gypsum and Hampshire Industries entered into settlement agreements with the City and dismissed their appeals, leaving Asbestospray as the sole defendant in this Group I appeal.

The Asbestospray Corporation was established in 1949 for the purpose of marketing and distributing the sprayed fiber products of the Asbestos Products Manufacturing Co., formed in 1947. Both companies were closely-held by members of the same family, and the businesses operated out of the same premises.[5]

---

fewer than all of the claims in an action (whether raised by original claim, counterclaim, cross-claim, or third-party claim), or that adjudicates less than an entire claim, or that adjudicates the rights and liabilities of fewer than all the parties to the action:

 (1) is not a final judgment;

 (2) does not terminate the action as to any of the claims or any of the parties; and

 (3) is subject to revision at any time before entry of a judgment that adjudicates all of the claims by and against all of the parties.

 **(b) When Allowed.**—If the court expressly determines in a written order that there is no just reason for delay, it may direct in the order the entry of a final judgment:

 (1) as to one or more but fewer than all of the claims or parties...."

 \* \* \* \* \* \*

5. With regard to the issues raised in both the trial court and in this Court, there has been no effort by any party to distinguish between the Asbestos Products Manufacturing Co. and the Asbestospray Corporation. In connection with its legal arguments in this Court, the Asbestospray Corporation calls itself and treats itself as a manufacturer. *See, e.g.,* Asbestospray's opening brief at 23 ("Asbestospray ceased manufacturing asbestos-containing products in 1971"), 42, 44; Asbestospray's reply brief at 11. Consequently, in replying to those arguments, we

The Asbestospray product is an asbestos-containing spray-on fireproofing that was installed in the six City buildings at issue in this appeal between 1956 and 1971. The greatest part of the compensatory damages award against Asbestospray represented $8,016,442.33 in costs to the City associated with rectifying the effects of and the complete removal of approximately 350,000 square feet of Asbestospray's fireproofing from Walbrook Senior High School. The asbestos fireproofing in Walbrook Senior High School had deteriorated, and had contaminated furniture, equipment and books in the school. Consequently, the City was required to pay for the cleaning and storage of each piece of furniture, equipment, and all books, and then to remove all asbestos fireproofing from the building. The remainder of the damages against Asbestospray comprised the cost of removing some or all of the asbestos-containing fireproofing located in the five other buildings at issue in this appeal, as well as the cost of operations and management programs for that asbestos which still remains.

Asbestospray raises numerous issues on appeal, and additional facts will be set forth in the particular parts of this opinion to which those facts specifically relate.[6]

---

shall treat Asbestospray as a manufacturer. By so doing, however, we do not intend to intimate that our discussions of the issues would or would not be any different if Asbestospray were regarded only as a marketer and distributor.

**6.** As previously mentioned, there were four alternative theories for the City's recovery of compensatory damages, and the jury found for the City on all four grounds. Two of them were in tort (negligence and strict liability) and two of them were in contract (express and implied warranties). The compensatory damages awards against Asbestospray were identical under all four theories, and Asbestospray has raised no issue on appeal concerning the *amount* of the compensatory damages awarded under any of the four theories. Consequently, if this Court determines that Asbestospray has failed to demonstrate reversible error with regard to any one of the four alternative theories, the judgment for compensatory damages must be affirmed.

On appeal, Asbestospray challenges both the tort and the warranty bases for the City's recovery of compensatory damages. Since we shall reject Asbestospray's arguments relating to the recovery in tort, we need not and do not reach the issues raised concerning the recovery on breach of warranty theories.

## I.

A threshold matter concerns the availability of negligence and § 402A strict liability tort remedies in an action by a property owner seeking only property damages because of a defect in a product which the owner had purchased. The compensatory damages which the City sought and recovered were for the cost of discovering, managing, rectifying the effects of, and removing the defective product, namely the asbestos-containing building material.

Traditionally, in cases to recover damages because of defective products, the loss of value or use of the product itself, and the cost to repair or replace the product, have usually been viewed as economic losses. *See Decoster v. Westinghouse,* 333 Md. 245, 250–251, 634 A.2d 1330, 1332–1333 (1994); 2 M. Stuart Madden, *Products Liability* § 22.21, at 334 (2d ed. 1988); William L. Prosser, *The Law of Torts* § 101, at 665 (4th ed. 1971); Comment, *Manufacturer's Liability to Remote Purchasers for "Economic Loss" Damages— Tort or Contract?,* 114 U.Pa.L.Rev. 539 (1966). Tort recovery for purely economic losses has ordinarily not been allowed. Instead, a purchaser suffering only economic loss because of a defective product will normally be limited to contract causes of action, including breach of implied and express warranties, and, in the case of fraud, to an action for deceit. *Decoster v. Westinghouse, supra,* 333 Md. at 250, 634 A.2d at 1332; Prosser, *supra,* § 107, at 708.

As previously indicated, in this case the greater part of the damages against Asbestospray was for the removal of the defective fireproofing from the Walbrook Senior High School, costs normally recoverable only by a contract action. Nevertheless, in the circumstances here, we hold that the City's tort claims for compensatory damages in this asbestos action are fully cognizable.

Even where a recovery, based on a defective product, is considered to be for economic loss, a plaintiff may still recover in tort if the defect creates a substantial and unrea-

sonable risk of death or personal injury. This legal principle
was firmly established in Maryland by *Council of Co–Owners
v. Whiting–Turner,* 308 Md. 18, 517 A.2d 336 (1986), in which
we upheld a negligence action to recover the cost of correcting
a dangerous condition allegedly created by the failure of a
general contractor and certifying architects to construct a ten-
story condominium with the proper fire resistant materials.
No fire had yet occurred, and the builder and architects
sought to defend, in part, on the ground that the plaintiff
council of unit owners had suffered only economic loss. 308
Md. at 24, 517 A.2d at 339. This Court, in an opinion by
Judge McAuliffe, refused to penalize the plaintiffs for "the
fortuitous circumstance of the nature of the resultant dam-
age." 308 Md. at 35, 517 A.2d at 345. Rather, we held that
"where the risk is of death or personal injury the action will
lie for recovery of the reasonable cost of correcting the
dangerous condition," regardless of whether the damages
constitute economic loss. *Ibid. See also Village of Cross
Keys v. U.S. Gypsum,* 315 Md. 741, 753–754, 556 A.2d 1126,
1131–1132 (1989) (applying the rationale of *Whiting–Turner* to
a claim for negligent misrepresentation involving a serious
risk of physical harm).

Courts elsewhere, considering claims for the cost of asbes-
tos removal, have similarly permitted the plaintiffs to proceed
in tort based on allegations that the asbestos-containing mate-
rials posed a substantial and unreasonable risk of personal
injury to building users. In *80 S. 8th St. Ltd. Ptsp. v. Carey–
Canada,* 486 N.W.2d 393, 397 (Minn.1992), the Supreme Court
of Minnesota rejected the defendant manufacturer's argument
that the plaintiff's tort claim could not be maintained because
it was for economic loss arising from the failure of asbestos-
containing fireproofing to perform satisfactorily. The court
permitted the plaintiff building owner to proceed in tort
because, "[i]n seeking the costs of maintenance, removal and
replacement, 80 South Eighth seeks the costs of eliminating
the risks of injury and of making the building safe for all those
who use and occupy this property." *Ibid.* Just as this Court
had earlier held in *Whiting–Turner, supra,* the Minnesota

court concluded by stating that, "[r]ather than waiting for an occupant or user of the building to develop an asbestos-related injury, we believe building owners should be encouraged to abate the hazard to protect the public." 486 N.W.2d at 398. *See generally* James L. Connaughton, *Recovery for Risk Comes of Age: Asbestos in Schools and the Duty to Abate a Latent Environmental Hazard,* 83 Nw.U.L.Rev. 512, 528–529 (1989). *But see Adams–Arapahoe School Dist. No. 28–J v. GAF Corp.,* 959 F.2d 868, 872–873 (10th Cir.1992).

Consequently, tort remedies were available to the City in this property damage case.

## II.

Asbestospray argues that the trial court erroneously recognized, in a case involving property damages only, a post-sale continuing duty to warn. The challenge to the continuing duty to warn focuses both on the jury instructions and on the admission of evidence pertaining to actions taken after 1971, when all of the sales at issue were complete.

The trial court gave the following jury instruction with respect to both the City's negligence and strict liability counts:

"A manufacturer or seller also has a continuing duty to warn of product defects which the manufacturer or seller discovers after the time of sale. Therefore, if a manufacturer or a seller discovers a product defect after the time of sale, the manufacturer and/or the seller must make reasonable efforts to issue a post-sale warning if the warning would help to prevent or lessen the harm. The post-sale duty to warn requires reasonable efforts to inform users of the hazards once the manufacturer or seller is or should be aware of the need of a warning."

Asbestospray makes the following arguments as to why a continuing duty to warn was improperly injected into the trial below. First, the defendant maintains that a continuing duty to warn is applicable only in personal injury actions. Furthermore, it argues that even if such a duty applies in certain types of property damage cases, it should not apply under the

special circumstances presented by asbestos removal cases. Finally, Asbestospray contends that, if the continuing duty to warn is applicable to this type of property damage case, the City failed to prove that a lack of a post-sale warning proximately caused any additional injury.

Relying upon *County of Anderson v. U.S. Gypsum Co.,* No. CIV–3–83–511, 1985 WL 116 (E.D.Tenn. May 3, 1985), *aff'd,* 821 F.2d 1230 (6th Cir.1987), Asbestospray contends that this Court should decline to recognize a continuing duty to warn in cases brought to recover property damages only. In *County of Anderson v. U.S. Gypsum, supra,* the plaintiff school system sought to recover from the manufacturer the cost of removing asbestos-containing ceiling plaster from two of its schools. The plaintiff proceeded on a failure to warn theory, and sought to introduce evidence relevant to the defendant's continuing duty to warn consumers of the hazards of asbestos-containing building materials. The court refused to admit this evidence, since Tennessee law did not recognize a continuing duty to warn in non-personal injury tort cases. The fact that the plaintiff school board removed the ceilings "because it feared that personal injury might otherwise have resulted to building occupants and users" was not deemed to be a sufficient basis to recognize a continuing duty to warn in property damage cases. Moreover, the court in *Anderson* indicated that even if it were to recognize a continuing duty to warn in some property damage cases, such a duty would not apply in an action for the cost of discovering, managing and removing asbestos products. The *Anderson* court stated: "At most, a post-[sale] warning would merely have speeded up the decision to remove the asbestos-containing acoustical ceiling plaster.... [T]here is no relationship between that timing and the actual cause of the plaintiff's damages." *Id.* at 3.

The opinions of this Court which have considered a continuing duty to warn, while all personal injury actions, have in no way limited the scope of the duty. Recently, in *Owens–Illinois v. Zenobia,* 325 Md. 420, 446–448, 601 A.2d 633, 645–647 (1992), we specifically addressed a product manufacturer's continuing duty to warn. The plaintiffs brought a strict

liability action under. § 402A of the Restatement (Second) of Torts, for the failure to warn of the hazards of asbestos. One plaintiff, Zenobia, had been exposed to the defendant's asbestos products at work in 1948, in 1951–1952, and again in 1968, and had developed asbestosis as a result of this exposure. Zenobia, a cigarette smoker, argued that a post-exposure warning from Owens–Illinois about the link between smoking and asbestosis may have prevented aggravation of his disease. Owens–Illinois had stopped manufacturing asbestos in 1958, and argued that, as a matter of law, it had no duty whatsoever to warn of product hazards after that date. This Court upheld the imposition of a continuing duty to warn on a manufacturer who has discontinued its product line. After reviewing earlier cases, we stated: "Generally, a manufacturer of a defective product has a duty to warn of product defects which the manufacturer discovers after the time of sale." 325 Md. at 446, 601 A.2d at 645. This duty may continue from the point at which the product was introduced into commerce, or may arise even where the product was reasonably safe for use at the time of manufacture and sale. *See Zenobia,* 325 Md. at 446, 601 A.2d at 645; *Rekab, Inc. v. Frank Hrubetz & Co.,* 261 Md. 141, 146, 274 A.2d 107, 110 (1971), quoting 1 Frumer & Friedman, *Products Liability* § 8.02, at 148.3.

■ As noted above, although both *Zenobia,* and the earlier opinion in *Rekab, Inc. v. Frank Hrubetz & Co.,* involved personal injuries, there is no indication from these opinions that the continuing duty to warn should be restricted to personal injury actions. In fact, one of the leading cases cited in *Zenobia* for the principle that a post-sale warning may be appropriate is *LaBelle v. McCauley Ind. Corp.,* 649 F.2d 46 (1st Cir.1981), a negligent failure to warn case involving only injury to property. *See also, e.g., Island Creek Coal Co. v. Lake Shore, Inc.,* 832 F.2d 274 (4th Cir.1987) (recognizing a post-sale duty to warn in a negligence action to recover property damages resulting from the breakdown of machinery); *Jones v. Bender Welding & Machine Works, Inc.,* 581 F.2d 1331, 1338 (9th Cir.1978); *Industrial Sugars, Inc. v. Standard Accident Insurance Co.,* 338 F.2d 673 (7th Cir.1964);

Clint W. Smith, *Post–Sale Warnings: Products That Go "Bump" in the Night,* 1984 Ariz.St.L.J. 719, 722.

As discussed in Part I of this opinion, an asbestos abatement case does not simply involve the loss of the defective product itself. Asbestospray's argument overlooks the risk posed to building users when the asbestos-containing products remain undiscovered, or improperly maintained, or unjustifiably in place because of a lack of a post-sale warning.

Moreover, we reject the defendant's contention that, as a matter of law, an asbestos removal plaintiff's injury is fixed upon the sale of the materials to the plaintiff, so that the failure to issue a post-sale warning can cause no additional injury. Contrary to the court's view in *County of Anderson v. U.S. Gypsum Co., supra,* it is clear to us that, in an action for the cost of discovering, managing, rectifying the effects of, and removing asbestos-containing materials, the plaintiff's damages are not necessarily fixed upon sale or installation. A warning given after a manufacturer has released the product may, in some instances, come in time to avoid installation. More commonly, when the product has been distributed and installed before knowledge of the defect reasonably could be attributed to the manufacturer, a warning later given when knowledge becomes available may still effect a savings to the consumer, because the costs of removal, replacement, and cleaning will likely be less at that time than at a later time when the consumer learns of the defect. In this case, for example, the record contains evidence of a significant increase in the cost of asbestos removal between 1984 and 1992. The trial judge instructed the jury that a post-distribution warning was required "if the warning would help to prevent or lessen the harm," and that an award could be made only for damages "proven to be a consequence of the defendant's conduct."

Finally, Asbestospray argues that, on the evidence, the City failed to demonstrate that it would have lessened its damages had it received an earlier warning. The defendant's contention is based in part on the argument that the City has not completely removed all of the Asbestospray products from its

buildings. It also claims that, since the cost of the City's operations and management program was determined to be a fixed amount per school per year, an earlier warning would only have increased operations costs in buildings in which the City has not yet removed all asbestos-containing materials.

In our view, however, we need not explore this point, since this Court has long recognized a presumption that plaintiffs would have heeded a legally adequate warning had one been given. *See Eagle–Picher v. Balbos*, 326 Md. 179, 227–229, 604 A.2d 445, 468–469 (1992); *Owens–Illinois v. Armstrong*, 326 Md. 107, 116–117, 604 A.2d 47, 51–52, *cert. denied,* —— U.S. ——, 113 S.Ct. 204, 121 L.Ed.2d 145 (1992); *Owens–Illinois v. Zenobia, supra*, 325 Md. at 448, 601 A.2d at 646, quoting *Lockwood v. AC & S, Inc.*, 109 Wash.2d 235, 260, 744 P.2d 605, 619 (1987); *Nizer v. Phelps*, 252 Md. 185, 205, 249 A.2d 112, 123 (1969); *Balto. Transit Co. v. State*, 194 Md. 421, 434, 71 A.2d 442, 447 (1950); *State v. Baltimore & O.R. Co.*, 157 Md. 256, 262, 145 A. 611, 613–614 (1929); *Lozzi v. Pennsylvania R. Co.*, 152 Md. 508, 510, 137 A. 293, 293 (1927); *Baltimore & O.R. Co. v. Stumpf,* 97 Md. 78, 91, 54 A. 978, 980 (1903); *Tucker v. State*, 89 Md. 471, 480, 43 A. 778, 781 (1899). This presumption is just as applicable in the case of property damage as it is in the case of personal injury. The evidence offered by Asbestospray to rebut the presumption was for the trier of fact to consider in determining whether receipt of a post-sale warning would have changed the City's behavior. The issue of causation relating to the defendant's failure to issue a post-sale warning was properly submitted to the jury.

Asbestospray additionally argues that the trial court erred in admitting evidence of the knowledge and conduct of asbestos manufacturers after 1971, when the sales of the Asbestospray products at issue in this case were completed. The defendant claims that this evidence contained "irrelevant information about knowledge that developed concerning asbestos ten, twenty, and thirty years later." As we noted above, however, a manufacturer has a continuing duty to warn of product defects discovered even long after the time of sale.

Post-sale evidence relating to the hazards of asbestos-containing materials and the industry reaction was relevant, then, to the continuing duty to warn and was properly admitted at trial. *See Perlmutter v. U.S. Gypsum Co.*, 4 F.3d 864, 870 (10th Cir.1993) (evidence of post-sale technical advancements and discoveries concerning asbestos-containing materials was relevant to the issue of whether a post-sale duty to warn existed). *See also Johns–Manville Sales Corp. v. Janssens*, 463 So.2d 242, 256 (Fla.Dist.Ct.App.1984), *review denied*, 467 So.2d 999 (Fla.1985) (evidence regarding the manufacturer's knowledge of the hazards of asbestos acquired after the last year that the plaintiff was exposed to asbestos, was relevant, *inter alia*, to the continuing duty to warn); *Lockwood v. AC & S, Inc., supra*, 109 Wash.2d at 257–260, 744 P.2d at 618–619 (post-exposure evidence was relevant to the claim that the manufacturer had a continuing duty to warn the plaintiff of the known dangers of its asbestos product).

### III.

Asbestospray assigns as prejudicial error the trial court's instructions on "state of the art." The manufacturer contends that the court's state of the art instruction under the negligence count was inconsistent with the court's state of the art instruction under the strict liability count, that the instructions were confusing, that "[t]o charge one manufacturer [of asbestos-containing products] with knowledge of another manufacturer [of asbestos-containing products] ... is absurd," and that "[t]o charge each manufacturer with what is 'scientifically discoverable' is totally divorced from the concepts of reasonableness and ordinary care...." (Asbestospray's brief at 44). The defendant also challenges the admission of two items of evidence as improper state of the art evidence.

As Judge Chasanow recently pointed out for the Court in *Bruce v. State*, 328 Md. 594, 614, 616 A.2d 392, 402 (1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 2936, 124 L.Ed.2d 686 (1993), quoting several earlier opinions, " 'it is well settled that "when an objection is raised to a court's instruction,

attention should not be focused on a particular portion lifted out of context, but rather its adequacy is determined by viewing it as a whole." ' " *See, e.g., Collins v. State,* 318 Md. 269, 283, 568 A.2d 1, 8, *cert. denied,* 497 U.S. 1032, 110 S.Ct. 3296, 111 L.Ed.2d 805 (1990); *Bowers v. State,* 298 Md. 115, 159, 468 A.2d 101, 124 (1983). Asbestospray, however, seizes upon particular parts of the trial court's instructions in isolation.

In its charge to the jury concerning state of the art in a negligence action, the trial court instructed as follows:

"A person who undertakes the manufacture or sale of a product ... must keep reasonably abreast of scientific knowledge and discoveries touching this product.... Manufacturers and sellers are held to what they knew or what they should have known at the time the products were manufactured or sold. What they should have known refers to what is knowable and what is scientifically discoverable in the medical and scientific community.

* * * * * *

"With regard to the negligence action, manufacturers and sellers are obligated to keep abreast of and are charged with knowing what other manufacturers and sellers knew about their products. The knowledge of one manufacturer can be a proper basis for concluding that another manufacturer should have warned of a specific danger."

In its charge under the strict liability count, the trial court stated:

"By state of the medical or scientific art, I mean what doctors or scientists generally accepted about a subject at a given time. The test is not what one doctor or even a group of doctors suspected at that time, but what the generally accepted view of the medical and scientific community was at the time that their products were sold."

"In considering this state of the art evidence, the issue for you to decide is when, if ever, the state of the generally accepted medical and scientific knowledge advanced to the point where the defendants had sufficient medical and scien-

tific information available to them from which you believe they should have concluded that the asbestos-containing products installed in the City buildings presented an unreasonable risk of harm to building occupants and workers."

Asbestospray characterizes the instructions as "inconsistent" in that "[i]n the negligence context, the Court described 'state of the art' to include ... attribution of knowledge from one manufacturer to the other," but that " 'state of the art' in the strict liability context was given a much narrower definition." (Asbestospray's brief at 41–42). Despite the fact that the two instructions were worded differently, we perceive no inconsistency and no confusion.

It is well established in Maryland that a manufacturer of a product is held responsible for knowing what was generally known in the scientific or expert community about the product's hazards. This principle applies in negligence actions, *Eagle–Picher v. Balbos, supra,* 326 Md. at 194–195, 604 A.2d at 452 (a manufacturer has a duty to keep abreast of scientific knowledge and discoveries regarding its product); *Babylon v. Scruton,* 215 Md. 299, 304, 138 A.2d 375, 378 (1958) (in negligence action, a manufacturer will be held to the knowledge of an expert in the field), and it applies in strict liability actions, *Owens–Illinois v. Zenobia, supra,* 325 Md. at 432–438, 601 A.2d at 638–641. What was known in the industry and in the scientific and expert communities about the product is referred to as "state of the art." *Zenobia,* 325 Md. at 434, 601 A.2d at 639. It includes not only discoveries by the general scientific community or discoveries reflected in the general scientific literature, but also the discoveries by scientists or experts employed by other manufacturers. *Zenobia,* 325 Md. at 444–445, 601 A.2d at 645 ("expert evidence [on state of the art] is not irrelevant merely because these experts were employed by private companies"); *Dartez v. Fibreboard Corp.,* 765 F.2d 456, 461 (5th Cir.1985) ("the knowledge of one manufacturer can be a proper basis for concluding that another manufacturer should have warned of a specific danger"). For this reason, there was no inconsistency between the trial court's reference to "doctors and scientists" in its strict liabili-

ty charge and the reference to the "other manufacturers" in its negligence charge. Moreover, in light of the instructions as a whole, the two instructions were not confusing.

■■■ Asbestospray also argues that the trial judge erred in instructing the jury that what the defendants should have known includes what is "scientifically discoverable" in the medical and scientific community. (Asbestospray's brief at 44). The phrase "scientifically discoverable" must be viewed in its proper context. *See, e.g., Bruce v. State, supra,* 328 Md. at 614–615, 616 A.2d at 402; *Collins v. State, supra,* 318 Md. at 283, 568 A.2d at 8; *Bowers v. State, supra,* 298 Md. at 159, 468 A.2d at 124. The phrase was used to explain to the jury that a manufacturer of a product is held responsible for what it should have known about the product. The phrase immediately followed the trial judge's statement that the knowledge element is time-restricted to "what [manufacturers] should have known at the time the products were manufactured or sold." Furthermore, when so restricted, the term has been used interchangeably with other definitions of state of the art. For example, in discussing the evidentiary burdens of proof to sustain a verdict under both negligence and strict liability theories, the court in *Dartez v. Fibreboard Corp., supra,* 765 F.2d at 469, stated that manufacturers are liable for failing to warn of "any risk associated with the product that is 'scientifically discoverable' ... by one with the 'knowledge and skill of an expert.'" This was quoted with approval in *Owens–Illinois v. Zenobia, supra,* 325 Md. at 444, 601 A.2d at 645. *See also Borel v. Fibreboard Paper Prod. Corp.,* 493 F.2d 1076, 1088 (5th Cir.1973), *cert. denied,* 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974) (strict liability action where the court stated that "[t]he requirement that the danger be reasonably foreseeable, or scientifically discoverable, is an important limitation of the seller's liability").

Asbestospray's argument, that it is "absurd" to charge one manufacturer of a product containing asbestos with the scientific knowledge about the product's hazards possessed by other manufacturers of products containing asbestos, simply

ignores the holdings in several Maryland cases and the relevance of the "state of the art." Recently, in *Owens–Illinois v. Zenobia, supra,* 325 Md. at 444–445, 601 A.2d at 644–645, we rejected the defendant's argument that certain deposition testimony was irrelevant as state of the art evidence merely because it was the testimony of an asbestos manufacturer's medical director rather than evidence from the general scientific community. Much earlier, in *Babylon v. Scruton, supra,* 215 Md. at 304, 138 A.2d at 378 (emphasis added), this Court held that

> "a person who undertakes such manufacturing will be held to the skill of an expert *in that business* and to an expert's knowledge of the arts, materials, and processes. Thus, he must keep reasonably abreast of scientific knowledge and discoveries touching his product and of techniques and devices used by practical men *in his trade.*"

Two sets of documents were admitted as state of the art evidence, and Asbestospray contends that they were not proper state of the art evidence. The first set, known as the Wetzel documents, consists of internal United States Gypsum correspondence from the late 1930's regarding a Gypsum bookkeeper who allegedly contracted asbestosis while working in the offices of one of Gypsum's manufacturing plants. The trial court admitted into evidence the Wetzel documents against all defendants, ruling that they were relevant to show state of the art. It may be true, as Asbestospray contends, that the Wetzel documents do not demonstrate *actual* knowledge on the part of United States Gypsum that asbestos-containing materials pose a hazard to building occupants. *See Sch. Dist. of Independence v. U.S. Gypsum,* 750 S.W.2d 442, 448 (Mo.Ct.App.1988) (upholding the exclusion of the Wetzel documents on the ground that they failed to satisfy the actual knowledge standard); *Sealover v. Carey Canada,* 793 F.Supp. 569, 577–578 (M.D.Pa.1992) (similarly holding that the Wetzel documents do not equate to actual knowledge). Nonetheless, as we noted in *Owens–Illinois v. Zenobia, supra,* 325 Md. at 444, 601 A.2d at 645, quoting *Dartez v. Fibreboard Corp., supra,* 765 F.2d at 461, the "actual knowledge of an individual

manufacturer is not the issue." State of the art "includes all of the available knowledge on a subject at a given time, and this includes scientific, medical, engineering, and any other knowledge that may be available." *Zenobia, supra,* 325 Md. at 434, 601 A.2d at 639. Thus the Wetzel evidence was admissible against Asbestospray as state of the art evidence of the danger posed by asbestos.

Second, Asbestospray complains of the admission of what is known as the Saranac documents. These documents reflect a series of animal experiments conducted in the late 1930's and early 1940's at the Lake Saranac Laboratory in New York. The experiments were performed by Dr. Leroy Gardner at the behest of numerous asbestos manufacturers, including United States Gypsum, who were interested in the health effects of exposure to asbestos dust. In 1943, Dr. Gardner issued an initial outline of his findings of a possible relationship between exposure to asbestos and malignant tumors in mice.

A review of the record reveals that, at trial, the Saranac documents were admitted only against United States Gypsum. Indeed, this point was clarified by counsel for Asbestospray upon their admission:

"Counsel: 'Admitted only against U.S. Gypsum?'

"The Court: 'Yes.'

* * * * * *

"Counsel: They are in against USG?

"The Court: U.S. Gypsum. You folks [Asbestospray] are out of this until we bring you back."

Furthermore, the Saranac documents were clearly marked with color-coded flags indicating that they were to be admitted only against United States Gypsum, and the jury was explicitly instructed that

"[d]ocuments admitted as to fewer than all Defendants are so identified.

* * * * * *

"You will be told what each [color-coded sticker] represents and so forth. . . . When you are deliberating, look for

the notations on each exhibit which indicates whether the exhibit was admitted only for a limited purpose and only as to a specific Defendant. These documents or exhibits will be so noted."

Since the Saranac documents were clearly only admitted against United States Gypsum, and since United States Gypsum is no longer a party to this appeal, we need not decide whether the Saranac documents would constitute appropriate state of the art evidence against Asbestospray.

## IV.

United States Gypsum, in its brief and oral argument in this Court, contended that, as a matter of law, the City had assumed the risk when it chose to install Gypsum's asbestos-containing fireproofing products in the City's police headquarters building. Construction on the police headquarters building began in 1971 and was completed in 1972. Gypsum alternatively complained about the trial court's jury instructions concerning Gypsum's assumption of the risk argument with respect to the police headquarters building. Both of Gypsum's assumption of the risk arguments were entirely limited to the police headquarters building.

Asbestospray raised no assumption of the risk issue in its briefs or oral argument in this Court. Nevertheless, in its reply brief, Asbestospray concluded by asserting that it "adopts and incorporates all of the arguments advanced by the other appellants in their briefs" (Asbestospray's reply brief at 13). After United States Gypsum settled with the City and dismissed its appeal, Asbestospray in a letter to the Court stated that it has "expressly adopted and continue[s] to press" United States Gypsum's argument as to, *inter alia*, "the defense of assumption of risk."

Asbestospray has no standing to press United States Gypsum's assumption of the risk argument relating to the police headquarters building. No Asbestospray products were installed in the police headquarters building. The City's compensatory and punitive damages claims against Asbestos-

pray did not involve the police headquarters building, and the jury's awards against Asbestospray were not based on anything relating to the police headquarters building.

## V.

Asbestospray raises several evidentiary issues concerning medical and scientific evidence that was admitted at trial. The purpose of this evidence was to establish the defective and dangerous qualities of asbestos-containing building materials generally, and of the specific Asbestospray fireproofing product installed in some of the City's buildings.

## A.

Asbestospray first contends that the trial court erred in permitting Dr. S. Levin to testify as to the results of a clinical survey which he and Dr. I. Selikoff conducted regarding the incidence of asbestos-related disease among New York City school custodians. Asbestospray argues that the expert testimony was inadmissible because, according to Asbestospray, it did not have access to any of the underlying data contained in the custodian study.[7] Asbestospray states that, without this background information, it was unable meaningfully to cross-examine Dr. Levin at trial.

Citing Lynn McLain, *Maryland Evidence* § 1006.1 (1987), Asbestospray frames the issue as one involving the law on summaries of evidence. Asbestospray characterizes the study as a summary of background evidence which is so voluminous as to make impractical its proof on an individual basis. Asbestospray argues that such summaries are admissible "only if the underlying data of the study are available for review, verification, and evaluation by the opposing party." (Asbestospray's brief at 33).

---

7. Such data includes a series of charts compiling medical history information, occupational history questionnaires, chest x-rays, pulmonary function tests, blood and urine tests, and consent forms. According to Dr. Levin, this medical data was protected by a longstanding policy of confidentiality.

The Levin–Selikoff study, however, is not a compilation or summary of written data so voluminous that it would be impractical to introduce each separate piece into evidence. Rather, the issue here is whether an expert witness may testify as to the results of research efforts, and whether that expert's written findings may be admitted into evidence, when the underlying scientific data was not voluntarily given to the opposing party and when the opposing party made no effort under the rules of procedure to obtain the underlying data.[8]

 Reports of scientific research are quite frequently considered by courts. *See, e.g., Department v. Bo Peep*, 317 Md. 573, 588–589, 565 A.2d 1015, 1022 (1989), *cert. denied,* 494 U.S. 1067, 110 S.Ct. 1784, 108 L.Ed.2d 786 (1990); *Cobey v. State,* 80 Md.App. 31, 559 A.2d 391, *cert. denied,* 317 Md. 542, 565 A.2d 670 (1989); *Clarksville–Montgomery County Sch. Sys. v. U.S. Gypsum Co.,* 925 F.2d 993, 1000–1001 (6th Cir. 1991); *City of Greenville v. W.R. Grace & Co.,* 827 F.2d 975, 980 (4th Cir.1987); *Sch. Dist. of Independence v. U.S. Gypsum, supra,* 750 S.W.2d at 452–453; *Rowan County Bd. of Educ. v. U.S. Gypsum,* 103 N.C.App. 288, 294–297, 407 S.E.2d 860, 863–864 (1991), *aff'd in part, review dismissed in part,* 332 N.C. 1, 418 S.E.2d 648 (1992); *Kershaw County Bd. of Educ. v. U.S. Gypsum Co.,* 302 S.C. 390, 397–398, 396 S.E.2d 369, 373–374 (1990); *Catasauqua Area School Dist. v. Raymark Industries, Inc.,* 662 F.Supp. 64, 70–71 (E.D.Pa.1987).

---

8. It is important to emphasize exactly what the defendant does and does not argue in this regard. Asbestospray does not present this Court with a discovery issue. *Compare, e.g., Farnsworth v. Procter & Gamble Co.,* 758 F.2d 1545, 1547 (11th Cir.1985); *Deitchman v. E.R. Squibb & Sons, Inc.,* 740 F.2d 556 (7th Cir.1984). Asbestospray did not argue at trial and does not argue on appeal that it should have had access to Dr. Levin's data. As the City points out in its brief, Asbestospray made no effort to obtain the data by legal process. In fact, at trial, Asbestospray expressly conceded that Dr. Levin was entitled to withhold the underlying data on the ground of confidentiality. Asbestospray also raises no hearsay issue concerning Dr. Levin's testimony or the report. Asbestospray merely contends that, since it did not have the underlying data because the data was obtained by a confidentiality promise, Dr. Levin should not have been permitted to testify regarding his study, nor should the study itself have been admitted into evidence.

Asbestospray has cited no cases, and we are aware of none, either in this State or elsewhere, holding inadmissible expert testimony based on scientific research on the ground that the other side did not have access to the data underlying the research.

The much-studied Agent Orange case, however, provides an excellent example of the opposite result. *In re "Agent Orange" Product Liability Litigation,* 597 F.Supp. 740 (E.D.N.Y.1984), *aff'd,* 818 F.2d 145 (2d Cir.1987). There, a Special Master was presented with discovery requests from both sides seeking to obtain the medical data underlying a 1984 Air Force study of military personnel involved in spraying Agent Orange in Vietnam. *See* Shira Scheindlin, *Discovering the Discoverable: A Bird's Eye View of Discovery in a Complex Multi-district Class Action Litigation,* 52 Brook. L.Rev. 397, 422–423 (1986). For various reasons, the Special Master did not order the United States government to produce the underlying medical records. *Id.* at 423. Despite the fact that the underlying data was not released to the parties, the United States District Court (Weinstein, J.) gave full consideration to the report. *See In re "Agent Orange" Product Liability Litigation, supra,* 597 F.Supp. at 782–783, 787–788. We can see no reason to adopt a rule that expert scientific testimony and a scientific report can never be admissible unless the opponents have been furnished with the raw data on which the testimony and report are based.

Asbestospray makes the general complaint that its inability to view the underlying data precluded it from engaging in any meaningful cross-examination of Dr. Levin. Nevertheless, the record discloses that, based on the information contained in the study itself, counsel for the defendants below were able to cast doubt on a number of the study's findings during their cross-examination of the author, Dr. Levin. Furthermore, the defendants fully cross-examined Dr. Levin with regard to the assumptions which he made in shaping his research. The fact that the defendants did not have the underlying data was fully revealed to the jury on cross-

examination, and it was emphasized in closing argument. In our view, the defendants' asserted lack of access to the data goes only to the weight the jury might give to the Levin–Selikoff study and to Dr. Levin's testimony rather than to the admissibility of such evidence. *Cf. Board of Education v. Hughes*, 271 Md. 335, 342, 317 A.2d 485, 489 (1974) (objection that income data introduced in a condemnation proceeding was two years old, "went to the weight of the evidence rather than to its admissibility. The Board was in a position to follow up on this on cross-examination and it did").[9]

### B.

Asbestospray next argues that the trial court should not have admitted into evidence a study conducted by Dr. L. Oliver regarding the incidence of asbestos-related diseases among Boston school custodians. Asbestospray claims on appeal that this medical study is irrelevant to any of the issues involved in an action for property damages only. A review of the record, however, indicates that Asbestospray failed to preserve a relevancy objection for appellate review.

Prior to trial, the defendants below filed a motion *in limine* to preclude any testimony about, reference to, or admission of Dr. Oliver's study. The defendants argued that the Oliver study did not establish any basic proposition advanced by the City in this action, but, instead, that the Oliver study

> "purport[ed] to establish only that custodians of buildings that contain in-place asbestos products are at a higher risk of developing pleural plaques, . . . [which] are not harmful to health and are not considered to be a disease."

---

9. The defendant additionally asserts that the Levin–Selikoff study was so incomplete as to be unreliable. Asbestospray contends that the City did not introduce the final version of the study into evidence, and also that the Levin–Selikoff study had not been subjected to peer review. At trial, Dr. Levin testified that there was a later, slightly amended version of the study, which "ha[d] no changes of substance." Moreover, Dr. Levin stated that his study had been accepted for publication by a medical journal and would undergo a peer review process prior to publication.

At trial, just before Dr. Oliver began to testify, the defendants mentioned their prior motion. The trial judge, indicating that the motion *in limine* had been denied, permitted Dr. Oliver to testify. Not long after Dr. Oliver took the stand, the City began questioning her about the custodian survey. Despite their earlier motion to exclude any such testimony, the defendants did not object to the City's line of questioning until the City sought to offer the Oliver study itself into evidence. When asked by the court for the specific grounds for the objection, counsel for United States Gypsum, speaking for all defendants, responded:

"Your honor, it's rank hearsay.... We have [Dr. Oliver] here to testify about her opinion. For that article to go back into the jury room with the jury is hearsay."

Asbestospray does not raise a hearsay issue in this Court with respect to the Oliver study. The defendant now claims that the earlier motion *in limine* to preclude the admission of the study, as well as to exclude any testimony about it or reference to it, on grounds of relevance, preserved the relevance challenge which it presses on appeal. We disagree.

■ Generally, where a party makes a motion *in limine* to exclude irrelevant or otherwise inadmissible evidence, and that evidence is subsequently admitted, "the party who made the motion ordinarily must object at the time the evidence is actually offered to preserve [its] objection for appellate review." *Prout v. State,* 311 Md. 348, 356, 535 A.2d 445, 449 (1988). *See Watson v. State,* 311 Md. 370, 372–373 n. 1, 535 A.2d 455, 457 n. 1 (1988); *Billman v. State Deposit,* 88 Md.App. 79, 114–116, 593 A.2d 684, 701–702, *cert. denied,* 325 Md. 94, 599 A.2d 447 (1991); *Beghtol v. Michael,* 80 Md.App. 387, 393, 564 A.2d 82, 85 (1989), *cert. denied,* 318 Md. 514, 569 A.2d 643 (1990); *McLain, Maryland Evidence, supra,* § 103.-12, at 33. *See also Rainville v. State,* 328 Md. 398, 402–403, 614 A.2d 949, 951 (1992).

■ In this case, the defendants did object to the introduction of the Oliver survey at the proper time. What the defendants failed to do, however, was to mention relevance

when specifically asked by the court to delineate the grounds for the objection. "It is, of course, well settled that 'where specific grounds are delineated for an objection, the one objecting will be held to those grounds and will ordinarily be deemed to have waived grounds not specified.'" *Thomas v. State,* 301 Md. 294, 328, 483 A.2d 6, 23 (1984), *cert. denied,* 470 U.S. 1088, 105 S.Ct. 1856, 85 L.Ed.2d 153 (1985); *Jackson v. State,* 288 Md. 191, 196, 416 A.2d 278, 282 (1980); *State v. Kidd,* 281 Md. 32, 38–39, 375 A.2d 1105, 1109–1110, *cert. denied,* 434 U.S. 1002, 98 S.Ct. 646, 54 L.Ed.2d 498 (1977); *von Lusch v. State,* 279 Md. 255, 263, 368 A.2d 468, 471 (1977); McLain, *Maryland Evidence, supra,* § 103.8, at 27–28.

Moreover, had the issue of relevance been preserved for our review, Asbestospray's argument would be without merit. Dr. Oliver's study concluded that the examined custodians had a "[pleural plaque] prevalence ... in excess of background." The study also concluded that these plaques "are attributable to asbestos exposure in schools." It has been recognized that "pleural plaques are the most common manifestation of exposure to asbestos." *Wright v. Eagle–Picher,* 80 Md.App. 606, 610 n. 2, 565 A.2d 377, 379 n. 2 (1989). Fundamental to the City's case was the claim that the presence of asbestos in building materials places occupants at risk of developing asbestos-related disease. The Oliver study, which demonstrated that Boston school custodians had been exposed to sufficient amounts of asbestos to cause pathological changes, properly aided the City in establishing this point.

### C.

Asbestospray challenges, on hearsay grounds, the admission of two additional studies concerning the incidence of asbestos-related disease among workers in public buildings. The first, authored by Dr. H. Anderson, involved a Wisconsin study of mesothelioma among public employees. The second was an investigation into asbestos-related disease among custodians in the Los Angeles School District by Drs. J. Balmes and K. Kilburn. Asbestospray argues that these reports were improperly admitted through the testimony of Dr. Oliver, be-

cause, it claims, Dr. Oliver did not participate in either of the studies and did not rely upon them in reaching her own expert opinion.

An expert may give an opinion based on facts contained in reports, studies, or statements from third parties, if the underlying material is shown to be of the type reasonably relied upon by experts in the field. *Hartless v. State*, 327 Md. 558, 578–579, 611 A.2d 581, 591 (1992); *Ellsworth v. Sherne Lingerie, Inc.*, 303 Md. 581, 602–603, 495 A.2d 348, 359 (1985); *Attorney Grievance Comm'n v. Nothstein*, 300 Md. 667, 679–684, 480 A.2d 807, 813–816 (1984); *Consol. Mech. Contractors v. Ball*, 263 Md. 328, 335–339, 283 A.2d 154, 157–159 (1971); McLain, *Maryland Evidence*, *supra*, § 703.1, at 237–240; David F. Binder, *Hearsay Handbook*, § 1.01, at 615 (3d ed. 1991). In addition, the underlying reports, data, or statements themselves may be admitted into evidence for the purpose of explaining the basis of the expert's opinion. *See, e.g., Ellsworth v. Sherne Lingerie, Inc.*, *supra*, 303 Md. at 603, 495 A.2d at 359; *Beahm v. Shortall*, 279 Md. 321, 327, 368 A.2d 1005, 1009 (1977); *Wilson v. Merrell Dow Pharmaceuticals, Inc.*, 893 F.2d 1149, 1152–1154 (10th Cir.1990). *See also Booth v. State*, 327 Md. 142, 190, 608 A.2d 162, 185, *cert. denied*, —— U.S. ——, 113 S.Ct. 500, 121 L.Ed.2d 437 (1992); *Department v. Bo Peep*, *supra*, 317 Md. at 589, 565 A.2d at 1023.[10]

---

**10.** Under this particular exception to the hearsay rule, where information received from others is relied upon in expert testimony, but is otherwise inadmissible hearsay, it ordinarily comes in not as substantive evidence but only to explain the factual basis for the testifying expert's opinion. *See Hartless v. State*, 327 Md. 558, 580–581, 611 A.2d 581, 592 (1992); *Ellsworth v. Sherne Lingerie*, 303 Md. 581, 603, 495 A.2d 348, 359 (1985); *Attorney Grievance Comm'n v. Nothstein*, 300 Md. 667, 676–684, 480 A.2d 807, 812–816 (1984); Lynn McLain, *Maryland Evidence*, § 703.1, at 240 (1987); David F. Binder, *Hearsay Handbook* § 1.01, at 615 (3d ed. 1991). In the case at bar, the studies were admissible for the limited purpose of explaining the basis for Dr. Oliver's testimony. Asbestospray did not at trial request a limiting instruction to this effect, did not object to the lack of a limiting instruction, *see* McLain, *supra*, at 80, and raises no issue on appeal with respect to the lack of a limiting instruction.

A review of the record shows that, contrary to the defendant's view, Dr. Oliver did reasonably rely upon the Balmes, Kilburn and Anderson studies in formulating the opinions she expressed at trial. Dr. Oliver noted that she had become aware of the other custodian studies while analyzing her own data. She also testified that she was familiar with the information contained in both of the studies.[11] Most importantly, during cross-examination it became clear that Dr. Oliver's testimony at trial had been shaped by the conclusions of Drs. Balmes, Kilburn and Anderson:

"Dr. Oliver: I think since this manuscript has been completed and published, there is additional information that has come to light that has given us a lot more information about the asbestos-containing material in buildings.

"Counsel: You're referring to some of the studies you talked about in your direct?

"Dr. Oliver: Yes."

The studies were thus properly referred to and admitted during Dr. Oliver's testimony.

### D.

Asbestospray assigns as error the admission of evidence concerning Rufus McIntosh, a Baltimore City employee who was afflicted with pulmonary asbestosis. Mr. McIntosh had worked for an extended period of time as a custodian in several of the City's school buildings which contained asbestos materials. The defendant argues that, because Mr. McIntosh did not work in the particular buildings at issue in this appeal, and was not exposed to Asbestospray's fireproofing product, the McIntosh evidence was irrelevant to the issues presented in this case. Alternatively, Asbestospray contends that the relevance of the evidence was outweighed by its prejudicial effect.

---

**11.** Drs. Oliver, Levin, Balmes and Anderson had together presented their findings at a June 1990 conference in New York City entitled "The Third Wave of Asbestos Disease: Exposure to Asbestos in Place. Public Health Control."

■ As we noted above with regard to the Oliver study, a major factual issue in this action was whether or not fibers released from asbestos-containing surface treatment materials pose a health hazard to building occupants. To be relevant, however, not every item of the City's evidence relative to this risk specifically had to involve Asbestospray's product. The McIntosh evidence, like the Oliver evidence, and the Balmes, Kilburn and Anderson studies, tended to show the health risk posed to building employees by "in-place" asbestos products generally. *See Mercer Univ. v. Nat'l Gypsum Co.*, No. CIV. A. 85–126–3–MAC, 1986 WL 12445, at 3–4 (M.D.Ga. Aug. 26, 1986) ("[t]he probative value of this testimony [regarding maintenance men] was not destroyed ... because the asbestos products to which the maintenance men were exposed were not shown to have been manufactured by the defendants"). *See also Sch. Dist. of Independence v. U.S. Gypsum, supra,* 750 S.W.2d at 449 ("Even assuming there was no such linking evidence [to the defendant's product], the [custodian] evidence was admissible ... to show the nature and seriousness of the harm posed by asbestos contamination in the Independence schools").

■ Furthermore, the record does not support Asbestospray's claim that any probative value of the McIntosh evidence was outweighed by its prejudice. Introduction of the McIntosh testimony was prefaced with an explicit explanation to the jury by the trial court that

"[t]he individual about whom the next witness will testify, ... Mr. Rufus McIntosh, he has worked in many Baltimore City public schools and public school buildings and has been exposed to thermal insulation or pipe and boiler materials in these buildings, and he has worked in one City school building that contains spray fireproofing materials, but has never worked in any of the buildings at issue in this trial and has never been exposed to any of the products of these defendants."

There is no indication from the record that the McIntosh evidence was used to create the impression that the City

custodian had indeed been injured by Asbestospray's product. Rather, the jury was charged with determining liability only for those asbestos-containing products installed in those buildings at issue in this case. The McIntosh evidence merely tended to show the health risks of asbestos-containing building materials.

### E.

The defendant argues that the deposition of Dr. Kenneth Wallace Smith should have been excluded because it did not meet the requirements of Maryland Rule 2–419 and, therefore, was not admissible under the common law former testimony exception to the rule against hearsay evidence.[12] Asbestospray claims that, because the Smith deposition was taken in an asbestos personal injury action and not a property damage case, and because Asbestospray was not present at the Smith deposition, it cannot properly be considered a "predecessor in interest" against whom the deposition could be used at trial.[13]

Recently, in *Owens–Illinois v. Zenobia, supra,* 325 Md. at 439–444, 601 A.2d at 642–645, we considered the Smith deposition in light of Maryland Rule 2–419. There, we rejected the defendant's narrow argument that a "predecessor in interest" may only be one who is in privity with an earlier party. 325 Md. at 440, 601 A.2d at 642–643. *See* McCormick,

---

12. Maryland Rule 2–419(a)(3)(C) permits the use of deposition testimony when the deponent is unavailable for trial. Rule 2–419(c) further permits the use of deposition testimony taken in another action

"if the other action was brought in any court of this State, of any other state, or of the United States, involved the same subject matter, and was brought between the same parties or their representatives or predecessors in interest."

13. Dr. Smith, who is now deceased, was deposed in January 1976, in relation to the case *DeRocco v. Forty-Eight Insulations, Inc.,* Nos. 7407–2880, 2881 (Pa.Ct.Com.Pleas 1974). *DeRocco* was brought by several insulation workers subjected to prolonged exposure to the asbestos products of fifteen defendants, including Johns–Manville Corp. Between 1944 and 1966, Dr. Smith served as medical officer and then as Medical Director for various Johns–Manville entities.

*Evidence,* § 256, at 620 (E. Cleary ed., 2d ed. 1972). Rather, we adopted a "motive to develop the testimony" test, saying (325 Md. at 440–442, 601 A.2d at 642–643, quoting *Clay v. Johns–Manville Sales Corp.,* 722 F.2d 1289, 1295 (6th Cir. 1983), *cert. denied,* 467 U.S. 1253, 104 S.Ct. 3537, 82 L.Ed.2d 842 (1984)):

> " ' "if it appears that in the former suit a party having a like motive to cross-examine about the same matters as the present party would have, was accorded an adequate opportunity for such examination, the testimony may be received against the present party." Under these circumstances, the previous party having like motive to develop the testimony about the same material is, in the final analysis, a predecessor in interest to the present party.' " [14]

In this case, Asbestospray's complaint that the *DeRocco* defendants did not have a similar motive to develop Dr. Smith's testimony is without merit. The fact that this case does not involve a request for personal injury damages does not mean that the defendants in the earlier proceeding did not have similar motives to develop the testimony. As discussed in Part I of this opinion, the tort causes of action in this case may be maintained on the ground that asbestos-containing building materials pose a significant health risk to building users. Thus, in considering a tort action for the cost of removing asbestos-containing materials, an underlying question remains whether exposure to asbestos is harmful to human health. In addition, despite the defendant's character-

---

**14.** New Maryland Rule of Evidence 5–804(b)(1), applicable to trials commencing on or after July 1, 1994, mirrors the language of Federal Rule of Evidence 804(b)(1) and thus, codifies the motive test adopted in *Owens–Illinois v. Zenobia,* 325 Md. 420, 439–444, 601 A.2d 633, 642–645 (1992). Rule 5–804(b) provides, *inter alia:*

> **"(b) Hearsay Exceptions.**—The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> (1) *Former Testimony.*—Testimony given as a witness in any action or proceeding or in a deposition taken in compliance with law in the course of any action or proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination."

ization of the Smith testimony as concerning only the hazards of occupational exposure to high levels of asbestos, the scope of the Smith deposition actually went much further. *See Matter of Johns–Manville/Asbestosis Cases*, 93 F.R.D. 853, 856 (N.D.Ill.1982) (noting that the Smith deposition was "much broader than J–M defendants would have it"). Dr. Smith testified not only to the various asbestos-related diseases occurring among Johns–Manville employees, but also to the potential danger posed to the bystander population. Such testimony would be expected to prompt extensive cross-examination on the probability of non-occupational risk. The *DeRocco* defendants, then, had the same motive as Asbestospray to subject Dr. Smith to searching cross-examination. The trial court did not err in admitting the Smith deposition.

### F.

We now turn to the defendant's argument that the trial court should not have admitted into evidence the testimony of Mr. R. Hatfield and Dr. W. Longo regarding their use of surface dust sampling to determine the level of asbestos contamination inside those City buildings at issue in this case.[15] Asbestospray contends first that the method by which surface dust is sampled and analyzed to establish asbestos concentrations is not generally accepted as reliable within the scientific community, and additionally, that the admission of expert testimony on the dust sampling results misled the jury. We disagree.

---

15. The process of dust sampling involves collecting dust with a micro-vacuum from a specified surface area, and then analyzing that dust under a transmission electron microscope ("TEM"). The microvacuum technique, initially developed by Mr. Hatfield, consists of a battery-operated personal air sampling pump, connected to an air sampling cassette with a filter inside. After vacuuming a measured surface area, the filter is sent to a laboratory to be analyzed for the presence of asbestos. There, the dust is placed in water and "sonicated" to disperse the particles and to separate any overlapping structures. Any asbestos fibers which might be present are then extracted through a filtration process and are counted by TEM. The numbers of asbestos fibers discovered are then extrapolated to estimate the number of fibers per square unit inside an affected building.

▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇

▇▇▇ The law is well settled in Maryland that, in order for expert testimony based on the application of a new scientific technique ordinarily to be admissible, the underlying scientific technique must be "generally accepted as reliable within the expert's particular scientific field." *Reed v. State*, 283 Md. 374, 381, 391 A.2d 364, 368 (1978), citing *Frye v. United States*, 293 F. 1013, 1014 (D.C.Cir.1923). *See, e.g., State v. Metscher*, 297 Md. 368, 374, 464 A.2d 1052, 1055 (1983); *Grimes v. State*, 297 Md. 1, 2–3, 464 A.2d 1065, 1066 (1983); *State v. Collins*, 296 Md. 670, 678–681, 464 A.2d 1028, 1032–1034 (1983); *Eley v. State*, 288 Md. 548, 553–554, 419 A.2d 384, 387 (1980); *Kelley v. State*, 288 Md. 298, 302, 418 A.2d 217, 219–220 (1980); *Thompson v. Thompson*, 285 Md. 488, 497, 404 A.2d 269, 274 (1979), *appeal dismissed*, 444 U.S. 1062, 100 S.Ct. 1002, 62 L.Ed.2d 745 (1980).

In arguing that the dust sampling method is "fraught with shortcomings that invalidate the procedure as a reliable scientific method," the defendant seems to urge that this Court conduct an independent scientific evaluation of the dust sampling process. By adopting the *Frye* test in *Reed v. State*, *supra*, however, we sought to avoid the "trial of the technique itself" which the defendant now presses. 283 Md. at 388, 391 A.2d at 371–372. Rather, the pertinent inquiry in deciding whether to admit the dust sampling testimony will be whether the methods used to determine the level of asbestos contamination in dust are generally accepted in the scientific field.

▇▇▇ In examining the record in the instant case, judicial opinions which have considered this question, and the available scientific commentary, *see Reed v. State, supra*, 283 Md. at 399, 391 A.2d at 377, it becomes clear that dust sampling through the processes employed here has achieved general acceptance in the scientific community. Such evidence has been accepted by numerous courts called upon to consider asbestos property damage claims. *See, e.g., Reorganized Church of Jesus Christ v. U.S. Gypsum*, 882 F.2d 335, 336–337, 339 (8th Cir.1989); *City of Greenville v. W.R. Grace &*

*Co., supra,* 827 F.2d at 980.[16] Furthermore, a 1989 protocol issued by the federal Environmental Protection Agency (EPA) supports the use of Mr. Hatfield's microvacuum device to evaluate projects for cleaning and contamination of asbestos-containing materials. Dr. Longo, an expert in material science and analysis, also submitted a supplemental affidavit in which he discussed the acceptance by the American Society for Testing Materials of the dust collection techniques used in the City's buildings.[17] At trial, both Mr. Hatfield and Dr. Longo testified to their own longstanding experience with the methods of dust sampling.

Certainly, the dust sampling technique is not free from criticism. The EPA materials introduced at trial indicated that there is no universally accepted protocol for the sampling and analysis of settled dust. The defendant's expert, Dr. Richard J. Lee, also testified that determining standard procedures for the collection, preparation and analysis of surface dust samples "was a matter of some discussion."[18] Under *Reed v. State,* however, scientific acceptance need not be universal in order to be considered "general." 283 Md. at 397, 391 A.2d at 376 ("A degree of scientific divergence of opinion is indeed inevitable"). The defendants have failed to direct this Court to any information which indicates that the divergence of opinion over the use of dust sampling amounts to the type of "fundamental division in the scientific community" which necessitates the exclusion of such testimony. 283 Md. at 392, 391 A.2d at 373.

Asbestospray also argues that the jury was misled because the City's experts reported their dust sampling results per

---

**16.** In all, the City provided the trial court with 14 asbestos-in-buildings cases in which testimony regarding dust sampling was admitted.

**17.** The American Society for Testing Materials is a private, non-profit organization which publishes voluntary standard methods for testing over a broad range of subjects, including indoor building pollution.

**18.** Dr. Lee also stated, however, that "the EPA recognizes that dust sampling has a potential utility to assess the amount of asbestos in the dust."

square foot rather than per square centimeter. This, the defendant claims, "multiplied all the results by several orders of magnitude and resulted in parading dramatically large figures ... in front of the jury." We find no merit to Asbestospray's argument of unfair prejudice. While it is true that a report in square feet will yield a larger total number of fibers than will a report in square centimeters, a report in square feet is simply another standardized method of conveying information about the area examined. *See City of Greenville v. W.R. Grace & Co., supra,* 827 F.2d at 980 (reporting the dust sampling results in terms of asbestos fibers per square foot).

For these reasons, we hold that Asbestospray has not shown that the admission of dust sampling testimony constituted reversible error.

## VI.

The final issue on this appeal concerns the City's claim against Asbestospray for punitive damages. Asbestospray argues that there was insufficient evidence of actual malice, under the standards set forth in *Owens–Illinois v. Zenobia, supra,* 325 Md. at 450–471, 601 A.2d at 647–659, for the punitive damages claim to have been submitted to the jury.

### A.

While the issue was not raised by any party, the claims for punitive damages in this case logically present a threshold question which we shall mention for purposes of future cases. That question is whether, under Maryland law, punitive damages are available in a non-intentional tort case involving only claims for property damages.[19]

---

**19.** By "non-intentional" torts we mean negligence actions and products liability actions brought under § 402A of the Restatement (Second) of Torts. *See Owens–Illinois v. Zenobia, supra,* 325 Md. at 460 n. 21, 601 A.2d at 653 n. 21.

In an intentional tort action where the claims for damages are based solely on injury to property or economic loss, this Court has taken the position that punitive damages can be awarded if the appropriate standards are met. *See, e.g., Nails v. S & R,* 334 Md. 398, 639 A.2d 660 (1994) (fraud action); *K & K Management v. Lee,* 316 Md. 137, 174–179, 557 A.2d 965, 983–985 (1989) (conversion); *Rite Aid Corp. v. Lake Shore Inv.,* 298 Md. 611, 626, 471 A.2d 735, 742–743 (1984) (malicious interference with contract or business relations, and slander of title); *Henderson v. Maryland Nat'l Bank,* 278 Md. 514, 366 A.2d 1 (1976) (conversion); *Daugherty v. Kessler,* 264 Md. 281, 286 A.2d 95 (1972) (malicious interference with contractual or business relations); *Nichols v. Meyer,* 139 Md. 450, 457–458, 115 A. 786, 788–789 (1921) (action of trespass *de bonis asportatis* ); *Knickerbocker Co. v. Gardiner Co.,* 107 Md. 556, 569–570, 69 A. 405, 410 (1908) (malicious interference with contractual or business relations); *Baltimore & Ohio R.R. Co. v. Boyd,* 63 Md. 325, 334–335 (1885) (action of trespass *quare clausum fregit* ). Furthermore, in a non-intentional tort action where damages are sought for personal injury or wrongful death, we have held that punitive damages are recoverable if the defendant acted with actual malice. *See, e.g., Komornik v. Sparks,* 331 Md. 720, 629 A.2d 721 (1993) (personal injury negligence action); *Eagle–Picher v. Balbos, supra,* 326 Md. at 233–234, 604 A.2d at 471–472 (wrongful death products liability action brought under a negligence theory); *Owens–Illinois v. Armstrong, supra,* 326 Md. at 128–129, 604 A.2d at 57 (personal injury products liability action brought under both negligence and strict liability theories); *Owens–Illinois v. Zenobia, supra,* 325 Md. at 450–473, 601 A.2d at 647–659 (personal injury products liability action brought under a strict liability theory); *Davis v. Gordon,* 183 Md. 129, 36 A.2d 699 (1944).

Nevertheless, we are aware of no prior opinion of this Court upholding an award of punitive damages in a non-intentional tort action involving only property damages. While this Court has not specifically discussed the question of the availability of punitive damages in a non-intentional tort property damage

case, there is language in some opinions which may indicate that, in a nonintentional tort case, there must be something more than injury to property for punitive damages to be available. *See, e.g., Conklin v. Schillinger,* 255 Md. 50, 70–71, 257 A.2d 187, 197–198 (1969); *Davis v. Gordon, supra,* 183 Md. at 133–134, 36 A.2d at 700–701.

Recently, in a few jurisdictions, this question has been explored with divergent results. In *Eisert v. Greenberg Roofing,* 314 N.W.2d 226, 228–229 (Minn.1982), the Supreme Court of Minnesota held that punitive damages could not be recovered in a strict products liability action where the plaintiff's claim was limited to property damages. In so holding, the Minnesota court distinguished between "the vital state interest" in protecting persons and the interest in protecting property, stating (314 N.W.2d at 229, quoting *Gryc v. Dayton–Hudson Corp.,* 297 N.W.2d 727, 737 (Minn.), *cert. denied,* 449 U.S. 921, 101 S.Ct. 320, 66 L.Ed.2d 149 (1980)):

> " '[T]he punitive damages remedy concerns the vital state interest of protecting persons against personal injury. The interests implicated in strict liability actions for injury solely to property are not so great as to warrant extension of this controversial remedy to those actions.' "

The court concluded by reiterating this distinction (*Ibid.*):

> "Punitive damages represent an extraordinary measure of deterrence. Denying their imposition in this case, after allowing punitive damages in strict liability actions for personal injury, reflects the higher value our society places on the safety of persons than it does on the security of property."

*See also Independent Sch. Dist. No. 622 v. Keene Corp.,* 511 N.W.2d 728, 732 (Minn.1994).

A concurring member of the Supreme Court of Missouri noted Minnesota's approach in *Kansas City v. Keene Corp.,* 855 S.W.2d 360, 377 (Mo.1993) (Holstein, J., concurring), another asbestos removal action involving damages identical to those claimed in the case at bar. Although the *Kansas City v. Keene Corp.* majority resolved the municipality's punitive

damages claim on traditional grounds,[20] the concurring opinion discussed for future consideration the possibility of limiting punitive damages to personal injury claims in non-intentional tort cases. Citing the urgent need to place "reasonable restrictions on when and how punitive damages may be sought and obtained," the concurring opinion suggested that punitive damages be disallowed "where there is no personal injury or illness and the claim arises solely because of a latent defect in a product." *Ibid.,* citing *Eisert v. Greenberg Roofing & Sheet Metal Co., supra,* 314 N.W.2d at 228.

On the other hand, the United States District Court for the District of New Jersey, in an asbestos removal case, rejected the defendant manufacturer's argument that punitive damages were unavailable, finding "no policy basis for denying an award of punitive damages in an economic loss products liability suit." *Cinnaminson T. Bd. of Educ. v. U.S. Gypsum Co.,* 552 F.Supp. 855, 863 (D.N.J.1982), *aff'd without op.,* 882 F.2d 510 (3d Cir.1989).

In the present case, the trial judge and all parties, both in the trial court and in this Court, proceeded on the basis that punitive damages were available under the actual malice standard set forth in *Owens–Illinois v. Zenobia, supra,* 325 Md. at 460–473, 601 A.2d at 653–659. Consequently, for purposes of this case, we shall assume that punitive damages are available in a non-intentional tort action involving only claims for property damages. *See Nails v. S & R, supra,* 334 Md. at 407–408 n. 3, 639 A.2d at 664–665 n. 3; *Murphy v. Edmonds,* 325 Md. 342, 375, 601 A.2d 102, 118 (1992); *Boyer v. State,* 323 Md. 558, 581 n. 15, 594 A.2d 121, 132 n. 15 (1991). *See also Adams v. Coates,* 331 Md. 1, 12, 626 A.2d 36, 41 (1993). Nonetheless, in our view, whether Maryland law permits the recovery of punitive damages in this type of action is an open question.

---

**20.** There, as here, the court did not decide whether punitive damages were available under Missouri law because the parties had not raised the issue on appeal. *Kansas City v. Keene Corp.,* 855 S.W.2d 360, 378–379 (Mo.1993).

B.

As previously discussed, in order to obtain punitive damages in a non-intentional tort action, a plaintiff must establish that the defendant acted with "actual" and not "implied" malice. *See Komornik v. Sparks, supra,* 331 Md. 720, 629 A.2d 721; *Owens–Illinois v. Zenobia, supra,* 325 Md. at 460, 601 A.2d at 652. *See also Davis v. Gordon, supra,* 183 Md. at 133, 36 A.2d at 701.

In products liability actions, we have held that a plaintiff has shown "actual malice" if the plaintiff demonstrates (1) that the defendant *actually* knew of the defective and dangerous condition of the product at the time it left the defendant's possession or control, and (2) that, "armed with this actual knowledge, the defendant consciously or deliberately disregarded the potential harm to consumers." *Zenobia, supra,* 325 Md. at 462–463, 601 A.2d at 654. Thus, we require proof of a "bad faith decision to market the product, knowing of the defect and danger, in conscious or deliberate disregard of the threat to the safety of the consumer." *Ibid.*

Moreover, we have held that to recover punitive damages in any tort action, the plaintiff must establish the requisite malice by clear and convincing evidence. *Zenobia, supra,* 325 Md. at 469, 601 A.2d at 657. *See also Eagle–Picher v. Balbos, supra,* 326 Md. at 234, 604 A.2d at 472; *Owens–Illinois v. Armstrong, supra,* 326 Md. at 128–129, 604 A.2d at 57.

The City argues that it has "clearly and convincingly ... met the requirements for punitive damages set forth in *Owens–Illinois v. Zenobia.*" To recover on its punitive damages claim, the City was required to show that Asbestospray actually knew, during the relevant time period, that its asbestos-containing fireproofing presented a serious health risk to ordinary building users. *See Kansas City v. Keene Corp., supra,* 855 S.W.2d at 375 ("Evidence of a generalized knowledge that asbestos poses a danger to a narrow class of unprotected persons who are exposed during the application

or removal of asbestos-containing materials in buildings will not, under the strict requirements for a submissible punitive damages case, support an inference that [defendants] had knowledge of a danger to the much broader class of persons who were merely present in such buildings at other times"); *Sch. Dist. of Independence v. U.S. Gypsum Co., supra,* 750 S.W.2d at 446 ("To make a submissible case for punitive damages, the School District was required to produce evidence that USG had actual knowledge of the product Audicote's propensity to release asbestos fibers"); *Catasauqua Area School Dist. v. Raymark Industries, Inc., supra,* 662 F.Supp. at 70 (knowledge of the risks of constant occupational exposure to asbestos was insufficient to prove outrageous behavior in an action for the costs of asbestos removal). The City was further required to prove that, armed with this knowledge, Asbestospray proceeded to market its fireproofing product in bad faith. The evidence introduced at trial, however, fell far short of the standard.

The bulk of the City's evidence against Asbestospray was contained in correspondence between corporate officer Herbert L. Levine and other members of the Sprayed Mineral Fiber Manufacturers Association ("the Association"). The Association was formed by asbestos manufacturers in 1965 for the purpose of furthering the research and development of sprayed mineral products and publicizing and advertising the uses and merits of the products of the sprayed mineral fiber industry. Levine variously served as the Association's president and its treasurer before the organization was dissolved in the mid–1970's, and much of the correspondence introduced as evidence against Asbestospray was generated by Levine while he served as president.[21]

---

21. The City also points to correspondence received by and generated by Association members other than Levine or anyone from Asbestospray. Such evidence includes a 1966 memorandum between two other Association members regarding the possibility of a standard reply to adverse comment prior to the receipt of final test results. There is no indication that Levine saw this correspondence or ever adopted the approach described therein.

In 1961, Levine became the patient of Dr. Irving J. Selikoff, a physician and noted researcher of the health effects of asbestos inhalation. Throughout the 1960's, Selikoff kept Levine apprised of the increasing scientific awareness of the carcinogenic properties of asbestos dust. Levine passed this information on to the other members of the Association in a series of memoranda.

It is clear from the information given by Selikoff to Levine that the focus of the doctor's research during the 1960's was upon the risk to workers in asbestos manufacturing plants and to workers in trades regularly utilizing asbestos products, such as installers. The early Selikoff studies introduced into evidence and cited by the City in support of its punitive damages claim contain no scientific data on the risk of asbestos exposure in non-occupational settings. For example, in March 1966, Levine wrote a memorandum to Association members and attached two articles citing Selikoff's findings. The articles refer to cancer rates among "asbestos workers" but not ordinary building users. These studies simply do not concern asbestosis or cancer rates among persons occupying buildings where asbestos products had been installed.[22]

---

22. As mentioned in Part V A, the focus of Selikoff's interest did eventually shift to the health effects on building occupants. The Levin–Selikoff study, along with the other post-sale evidence introduced at trial cannot, however, be used to establish the City's claim for punitive damages. As *Owens–Illinois v. Zenobia, supra,* 325 Md. at 462–463, 601 A.2d at 653–654, made clear, our punitive damages test has a temporal element. *See Sch. Dist. of Independence v. U.S. Gypsum Co.,* 750 S.W.2d 442, 446 (Mo.Ct.App.1988) (rejecting the plaintiff's punitive damages claim stating, "[t]he School District produced no evidence, . . . that, at the time USG sold Audicote to the School District, USG has knowledge of these facts"). *See also Sealover v. Carey Canada,* 793 F.Supp. 569, 579 (M.D.Pa.1992) ("Evidence that . . . U.S. Gypsum learned of the hazards of asbestos sometime after Sealover's exposure is in no way probative of what they actually knew prior to Sealover's exposure"). While we acknowledge that there may be cases where particular post-sale evidence may tend to show actual knowledge and conscious disregard at the time of sale, evidence which merely demonstrates an awareness acquired after sale does not indicate actual malice at the time of sale. None of the City's post-sale evidence sheds any light on Asbestospray's knowledge at the time of sale.

In May 1966, Levine wrote members of the Association that Selikoff had been in contact with an architect in Canada who called to Selikoff's attention

> "the fact that using sprayed fibre as a fireproofing medium in return air plenums, subjects the people occupying the building to asbestos dust, by virtue of erosion of that material during the use of the plenum chamber."

Although the City argues that relating Selikoff's concern indicates actual knowledge on the part of Levine, a further reading of this memorandum leads to the opposite conclusion. In the memorandum, Levine immediately dismisses Selikoff's story as impossible, stating that he

> "pointed out to Dr. Selikoff how erroneous this was, by virtue of the fact that the filtering apparatus in the air conditioning system would catch any dust, and furthermore, we treated the sprayed minerals to prevent this erosion and dusting."

The evidence indicates that, during the relevant time period, Levine believed that his product could be properly sealed to prevent fiber release. At trial, Levine testified on cross-examination that the company had "always stipulated from the time we went into business that every exposed installation of Asbestospray irrespective of what it was used for had to have a seal coat on it." He also spoke of the effectiveness of the sealant with regard to installations of the product in his own home.[23] Viewed in its entirety, this evidence in no way establishes the malice necessary under Maryland law to recover punitive damages, even if Levine's belief about encapsulation may have been erroneous.

In 1969, Levine attended a conference of contracting plasterers and lathers at which Selikoff voiced his fears regarding the "careless" spraying of asbestos insulation and fireproofing material. Selikoff lectured that, immediately after asbestos insulation has been sprayed, loose particles surround the

---

**23.** Installed in 1952, the asbestos-containing product remained in the Levine residence at least until early 1971, when the family moved.

building, possibly endangering large numbers of persons. Selikoff, however, did not discuss the subject of asbestosis or cancer rate increases among either building occupants or the population in general. *See Kansas City v. Keene Corp., supra,* 855 S.W.2d at 374–375 (rejecting Selikoff's statements as insufficient to establish knowledge of the health hazards to users of a building). Rather, at the conference, Selikoff argued, not for a ban on sprayed asbestos products, but for the immediate development of "stringent" regulations for their sprayed application. There is nothing in this evidence to link Selikoff's generalized suspicions either with the Asbestospray product or with Asbestospray's own methods for application.

The City also argues that the results of dust emissions tests commissioned by the Association during the mid and late 1960's established actual knowledge that Asbestospray's product released significant amounts of asbestos dust. In fact, however, the results obtained warrant no such conclusion and do not appear to have placed Levine on notice of the risk posed to building users. The first test which the City calls to our attention was conducted in 1966 on a construction site. There is no mention of Asbestospray's product in connection with this test, nor any indication that the results would have been the same had Asbestospray's product been tested. A second test, in early 1967, examined the asbestos products of each of the four members of the Association. The products were sprayed onto a laboratory ceiling space nine feet above the floor and onto an adjacent wall. Air samples were collected after each spraying. While each of the products exceeded the established threshold limit values for fiber release, the consultants who prepared the tests rated only certain of the products unfavorably. With regard to Asbestospray's product, the report concluded that it was altogether "conceivable that the Asbestospray product … could be sprayed in an open building under construction using the most favorable air water gun, product flow rate and water to dry fiber ratio at airborne dust concentrations near or less than the threshold limit value of five million particles per cubic feet of air."

When the members of the Association convened to discuss these findings, no one indicated an awareness that applying the materials created a hazard to ordinary building users. Discussion at Association meetings focussed solely upon industry workers and workers in related trades, and the members resolved to institute further tests to determine the distances from spraying which could be considered safe for workers, and to develop industry-wide standards to avoid any health hazard. These decisions reflect the belief that safe conditions could indeed be created. *See Angotti v. Celotex Corp.*, 812 S.W.2d 742, 748 (Mo.Ct.App.1991) (stating that advice received from an expert that the company should provide technical consultation to users showed belief that products could be used safely). They do not establish actual knowledge of the hazard posed to building users.

The evidence shows that, as late as 1969, Levine did not possess the knowledge that his product, once installed, would harm occupants of a building. When requested to provide information in 1969 on the presence of respirable asbestos dust in occupied buildings, Levine responded that "we do not have any information relative to this at the moment." Concerned about the problem suggested by the inquiries, Levine called for immediate emissions testing of areas near air conditioning vents and sprayed fiber acoustical ceilings.

The Association did commission additional tests in 1970 for the purpose of "mak[ing] a preliminary assessment of the probability that asbestos fibers were being added to the air stream in its passage over sprayed mineral fiber fireproofing." The tests were run inside an operating office building which had been sprayed with U.S. Mineral Product Company's CAF-CO product in 1966. The report prepared for Association members concluded that "[t]he returning air is in contact with sprayed mineral fiber fireproofing during most of its passage back to the mechanical room." The air fiber concentrations were larger than the testers had noted in buildings in which the air did not come into contact with asbestos-containing fireproofing. Whatever this information may have disclosed about the U.S. Mineral Product Company's product, it reveals

nothing about the Asbestospray product or its condition once installed in a building. *See Kansas City v. Keene Corp., supra,* 855 S.W.2d at 375 (rejecting evidence of flaking and dusting of an unsealed asbestos ceiling at Rutgers University where there was "no showing that the material on the ceiling at Rutgers University was the same or similar to Keene's product").

We conclude that the City failed to introduce sufficient evidence of actual malice on the part of Asbestospray for the punitive damages claim to have been submitted to the jury.

Therefore, we affirm the portion of the judgment against Asbestospray representing compensatory damages, and we reverse the portion of the judgment against Asbestospray representing punitive damages.

*JUDGMENT OF THE CIRCUIT COURT FOR BALTI-MORE CITY AGAINST THE DEFENDANT ASBESTOS-PRAY CORP. AFFIRMED IN PART AND REVERSED IN PART, AND CASE REMANDED TO THAT COURT FOR THE ENTRY OF JUDGMENT IN ACCORDANCE WITH THIS OPINION. EACH PARTY TO PAY ITS OWN COSTS.*