*Isa Manuel Santiago v. State of Maryland*, No. 10, September Term, 2017.  Opinion by Getty, J.

**EXPERT WITNESS TESTIMONY – MARYLAND RULE 5–702(3) – SUFFICIENT FACTUAL BASIS**

An expert witness in a murder case had a sufficient factual basis to testify about a defendant's cellular phone records from the night of the murder.  The expert worked for Cingular Wireless ("Cingular"), defendant's cellular phone provider, and was responsible for analyzing the defendant's cellular phone records prior to the defendant's trial.  During his investigation, the expert determined that the defendant's phone records from the night of the murder were implausible due to technological error.  The expert amended the flawed records and created a spreadsheet ("2003 Index") displaying his findings.  At the defendant's second trial, the expert brought the 2003 Index and testified about his methodology.  Following defendant's conviction, a new trial was granted.  The expert again testified about his methodology although the 2003 Index had been destroyed by the time of the new trial.  Because of the expert's many years of experience and his particularized knowledge of Cingular's network, the expert had a sufficient factual basis to testify as to the defendant's phone records at this third trial even though the 2003 Index was unavailable.  Thus, the trial court did not err in admitting the expert testimony under Maryland Rule 5-702(3), and the Court affirmed the judgment of the Court of Special Appeals.

**CRIMINAL LAW – FIFTH AMENDMENT – APPLICABILITY**

The Court of Appeals held that the trial court did not err when it found that the defendant did not have a Fifth Amendment right when the defendant filed an automobile insurance claim and failed to comply with the insurer's policies because the defendant was not compelled to make self-incriminating statements, the defendant voluntarily and affirmatively made the claim to his automobile insurer, and there was no police involvement during the claim.

**EVIDENCE – MARYLAND RULE 5–403 – RELEVANCE**

The Court of Appeals held that the trial court did not err when it admitted Mr. Santiago's failure to submit to an examination under oath for his voluntary auto insurance claim as evidence of Mr. Santiago's consciousness of guilt as the admission of this failure was relevant.  Thus, the Court affirmed the Court of Special Appeals.

Circuit Court for Charles County
Case No. 08-K-04-000477
Argued: October 5, 2017

IN THE COURT OF APPEALS
OF MARYLAND

No. 10

September Term, 2017

_____

ISA MANUEL SANTIAGO

v.

STATE OF MARYLAND

_____

Barbera, C.J.
Greene,
Adkins,
McDonald,
Watts,
Hotten,
Getty,

JJ.

_____

Opinion by Getty, J.

_____

Filed: March 27, 2018

In this case, we are asked to determine whether the trial court erred in admitting the expert opinion testimony of Allen Hagy ("Mr. Hagy"). Additionally, we must determine whether the trial court erred by admitting evidence of Respondent Isa Manuel Santiago's ("Mr. Santiago") silence during an investigation by his automobile insurer.

For the following reasons, we conclude that the trial court did not err in admitting the expert testimony under Maryland Rule 5-702(3). We also hold that the trial court did not err when it admitted Mr. Santiago's failure to submit to an examination under oath for his voluntary automobile insurance claim as evidence of Mr. Santiago's consciousness of guilt because the admission of this failure was relevant. Accordingly, we affirm the judgment of the Court of Special Appeals.

## BACKGROUND

### A. *The Murder and Investigation*

During the morning of Friday, June 13, 2003, LaToya Taylor ("Ms. Taylor") told a coworker that during her lunch break she was going to meet with someone who owed her money. Security camera footage captured Ms. Taylor leaving her employment in Washington, D.C. and stepping into a "box-type black truck." Ms. Taylor did not return from her lunch break. The security footage was the last record of Ms. Taylor seen alive. Six days later, Ms. Taylor's body, wrapped in trash bags and with a single gunshot wound to the back of her head, was found in a field in Charles County, Maryland.

In the early morning hours on Saturday, June 14, 2003, police were called to a vehicle fire on Spring Road in Northwest Washington, D.C. Police officers found a black Jeep Cherokee, registered to Mr. Santiago, engulfed in flames at the scene. Police officers

also discovered a gasoline container next to the Jeep Cherokee. William Walker ("Mr. Walker") told police that he witnessed a car that stopped next to the parked Jeep Cherokee and saw a man exit the car on the passenger side. The man then walked "up to the" Jeep Cherokee and "either went in or was at the car door." Mr. Walker stated that the Jeep Cherokee "eventually caught on fire" and the other vehicle then sped off. Following an investigation, police concluded that the fire had been intentionally set with the use of gasoline. Additionally, the investigation established that the ignition of the Jeep Cherokee had not been tampered with which led police to the conclusion that the Jeep Cherokee must have been driven to its location by using the vehicle's key.

At approximately noon on June 14, 2003, Mr. Santiago contacted police and reported that his Jeep Cherokee had been stolen. Lieutenant Robert Black, a Prince George's County police officer, interviewed Mr. Santiago at his home about the stolen vehicle. Mr. Santiago stated that he had returned to his home from a nightclub at 3:00 a.m. and had parked the Jeep Cherokee on the street near his residence. Mr. Santiago recalled that he did not notice his Jeep Cherokee missing until he took the trash out. During the interview, Lieutenant Black noted that Mr. Santiago was in contact with his automobile insurance agent and that Mr. Santiago's trash cans were still located inside the home.

During the investigation into Ms. Taylor's disappearance, police acquired information that led them to believe Mr. Santiago was involved. Ms. Taylor and Mr. Santiago had an extensive and turbulent relationship. Kimberly Smith ("Ms. Smith") recounted that Ms. Taylor and Mr. Santiago met as teenagers. Although they never married, Ms. Taylor and Mr. Santiago were romantically associated for approximately a

2

decade prior to Ms. Taylor's disappearance. Ms. Smith would later testify that Mr. Santiago and Ms. Taylor's lengthy relationship included acts of domestic violence perpetuated by Mr. Santiago. At the time of her death, Ms. Taylor had a civil action pending against Mr. Santiago in which she sought child support. Mr. Santiago disputed paternity in this matter and later told police officers "his wife did not know he was the father of [Ms. Taylor's] youngest child" although Mr. Santiago asserted that "they [Ms. Taylor and Mr. Santiago] had resolved the child support issues." A court hearing to resolve the child support issues had been scheduled for June 18, 2003.

Detective Charles Seward spoke to Mr. Santiago about Ms. Taylor's disappearance on the evening of June 14, 2003. Mr. Santiago stated that on the morning of Ms. Taylor's disappearance, he and Ms. Taylor had spoken on their cellular phones. Mr. Santiago contended that the conversation between the two related to the child support hearing. After this call with Ms. Taylor, Mr. Santiago stated that he took a nap until the early afternoon, ran errands with his wife, went to dinner with his wife in Baltimore, and then headed to a nightclub in Washington, D.C. following dinner. During the interview, Mr. Santiago asked Detective Seward to speak quietly because Mr. Santiago's wife was sleeping and she disliked overhearing discussions about Ms. Taylor because the three were involved in a "love triangle."

Other evidence contradicted Mr. Santiago's version of the events on the date of Ms. Taylor's disappearance. Mr. Santiago's children's daycare provider would later recall that at 4:27 p.m., Mr. Santiago called and told the daycare that he would not be able to pick up his children due to an emergency. Mr. Santiago's wife would later retrieve the children.

3

Surveillance video from a Bank of America branch in Prince George's County showed that Mr. Santiago used the bank's ATM at 4:31 p.m. The surveillance video also showed Mr. Santiago exiting his black Jeep Cherokee.

John Naumoff ("Mr. Naumoff") stated that at approximately 5:38 p.m., he saw a dark Jeep Cherokee emerge from a forested area close to where Ms. Taylor's body was found in Newburg, Charles County. Because Mr. Naumoff worked as a service manager at a car dealership, he was able to confidently identify the car as a Jeep Cherokee. He was also able to specify the time when he had seen the dark Jeep Cherokee because Mr. Naumoff's E-ZPass clocked in at a nearby toll booth. Mr. Santiago called a friend, Chiquita Jenkins ("Ms. Jenkins"), at approximately 5:50 p.m. At trial, Ms. Jenkins testified that she believed Mr. Santiago was travelling in a car while they spoke on the phone.

At about 7:30 p.m., Mr. Santiago and his wife stopped by the home of his friend, Paris Jefferson ("Mr. Jefferson"), even though Mr. and Mrs. Santiago knew Mr. Jefferson was not home. The Santiagos visited with Mr. Jefferson's son for approximately thirty minutes before departing. Mr. Jefferson's home was located on Spring Road in Northwest Washington, D.C. Jamal Wilson ("Mr. Wilson") stated that he had seen Mr. Santiago at around 3:27 a.m. on June 14, 2003, outside of a bar in Northwest Washington, D.C. Mr. Wilson testified that Mr. Santiago was riding a motorcycle at that time.

Although Mr. Santiago's Jeep Cherokee was badly damaged in the fire, police were able to find grass fragments within the undercarriage of the vehicle which were consistent with grass found in the field where Ms. Taylor's body was found. Additionally, police

recovered carpet fibers on Ms. Taylor's clothing which matched the automobile carpet fiber samples from the Jeep Cherokee.

At trial, the State's theory was that Mr. Santiago killed Ms. Taylor on June 13, 2003 after he used the ATM in Prince George's County at 4:31 p.m. and before the 5:50 p.m. call to Ms. Jenkins. In support of its timeline, the State planned to introduce Mr. Santiago's cell phone records from June 13, 2003 to show that Mr. Santiago was located in Charles County at the approximate time of Ms. Taylor's murder.

**B.** *First and Second Trials*

On May 25, 2004, the State indicted Mr. Santiago in the Circuit Court for Charles County for the murder of Ms. Taylor and other crimes associated with the murder. Mr. Santiago's first trial ended in a mistrial on February 28, 2006 prior to any evidence being presented. Mr. Santiago's second trial began the next day, March 1, 2006. During this trial, the jury acquitted Mr. Santiago of first-degree murder but convicted him of second-degree murder, use of a handgun in the commission of a crime of violence, and being a felon in possession of a firearm. Following sentencing for these convictions, Mr. Santiago noted an appeal. The Court of Special Appeals, in an unreported opinion, reversed the judgment of the trial court due to the failure to either hearken or poll the jury. *Santiago v. State*, 183 Md. App. 770 (2008). The State filed a petition for writ of certiorari, which this Court granted. *State v. Santiago*, 407 Md. 529 (2009). In our decision, we held that "a jury verdict, rendered and announced in open court, that is neither polled nor hearkened is not properly recorded and is therefore a nullity" and we remanded the case to circuit court for a new trial. *State v. Santiago*, 412 Md. 28, 32, 42 (2009).

5

**C.** *Third Trial*

The State, on remand, charged Mr. Santiago with first-degree murder in addition to the same charges for which he was convicted in the 2006 trial. Mr. Santiago filed a motion to dismiss the first-degree murder charge, arguing that the re-charging was a violation of double jeopardy. The circuit court denied the motion, and Mr. Santiago appealed the judgment. In March 2013, the Court of Special Appeals held that, although the 2006 jury verdicts were nullities due to the failure to hearken or poll, the acquittal of first-degree murder barred re-prosecution. *Santiago v. State*, 210 Md. App. 708 (2013). The State did not file a petition for writ of certiorari.

In 2015, the prosecution presented its case for a third time and a jury in the Circuit Court for Charles County convicted Mr. Santiago on all remaining counts. The circuit court sentenced Mr. Santiago to a thirty-year prison term for second-degree murder, a twenty-year consecutive prison term for use of a handgun, and a five-year cumulatively consecutive prison term for illegal possession of a firearm. The collective prison term totaled fifty-five years. Mr. Santiago appealed his conviction to the Court of Special Appeals, which unanimously affirmed the judgment of the circuit court in an unreported opinion. *Santiago v. State*, No. 1694, Sept. Term, 2015, 2017 WL 347604, at \*1 (Md. Ct. Spec. App. Jan. 24, 2017).

Mr. Santiago then petitioned this Court for a writ of certiorari, which we granted on May 9, 2017. *Santiago v. State*, 453 Md. 9 (2017). Mr. Santiago presents two questions for our review:

6

1. Did the trial court err in finding a sufficient factual basis to admit testimony from the State's cellular communication expert, Allen Hagy?

2. Did the trial court err in admitting evidence of Mr. Santiago's silence during an investigation by his automobile insurer that was related to and concurrent with the police investigation in this case?

## DISCUSSION

### A. Admissibility of Expert Testimony

#### i. Testimony of Allen Hagy

Allen Hagy was Cingular's senior network engineer for the Maryland, Virginia, West Virginia, and Washington, D.C. region prior to Mr. Santiago's second trial. Cingular's fraud and billing department was responsible for producing cellular phone records in response to court orders or subpoenas. The fraud and billing department then sent those records to the network engineer responsible for the local market referenced in the records. Because Mr. Santiago's phone calls occurred in Mr. Hagy's geographic market, his job was to validate Mr. Santiago's records sent from the fraud and billing department.

Using phone records, a cellular expert may be able to approximate the location of a mobile phone call using "historical cell site analysis." *See State v. Payne*, 440 Md. 680, 696–97 (2014). When compiling the historical cell site analysis, call detail records ("CDRs"), which list calls to and from a phone and the towers to which a phone connected for calls, and tower indices, which list the locations of cell towers, are paramount factors. CDRs assign three data points for each call: (1) the "switch" through which the call was

7

routed, (2) the particular "cell site" within the switch's control that connects the call to a network, and (3) the "radio channel" at the cell site which carries the call through the airwaves. In 2003, there were four Cingular switches in the Washington D.C./Baltimore region: Switch 1 controlled Virginia and West Virginia, Switch 2 controlled southern Maryland, Switch 3 controlled northern Maryland, and Switch 4 controlled Washington, D.C. Within each switch, there were multiple cell sites, and each cell site contained multiple radio channels.

In June 2005, Mr. Hagy received Mr. Santiago's cell phone records from Cingular's fraud and billing department for the day of Ms. Taylor's disappearance. Mr. Hagy did not perform the historical cell site analysis but did analyze the relevant CDRs. During his review, Mr. Hagy discovered "geographical inconsistencies" between several call entries, leading him to believe that the CDRs were inaccurate. These "geographical inconsistencies" did not come as a surprise to Mr. Hagy as Cingular had undergone a "rehoming" process in late 2003 and 2004. Mr. Hagy testified that during a rehoming process, cell towers and switch numbers were reassigned due to growth or reduction in cellular usage in certain geographical areas. Instead of the subpoenaed records in 2005 being retrospective to account for the rehoming process, it was Mr. Hagy's belief that the fraud and billing department sent Mr. Hagy switch information based upon the company's latest data which included the reassigned switch numbers. While analyzing the subpoenaed reports, the "geographical inconsistencies" Mr. Hagy found showed that some of the cell sites listed on the CDRs contained radio channel numbers that did not exist. Additionally, Mr. Hagy noted that nine calls placed from Mr. Santiago's phone only minutes apart were

8

routed through a northern Maryland cell site and a Virginia cell site. Because connection to a cell site is predicated upon the strongest available signal and because Mr. Santiago could not have travelled from Northern Maryland to Virginia in a matter of minutes, Mr. Hagy concluded that the data provided must be flawed.

After reaching this conclusion, Mr. Hagy initiated a "data dump" in which he utilized a software program to identify Cingular's network makeup at the time of Mr. Santiago's 2003 calls. Through this "data dump," Mr. Hagy was able to create a comprehensive spreadsheet ("2003 Index") that identified the corresponding switches, cell sites, and radio channels for the Washington D.C./Baltimore region at the time of the murder. This 2003 Index then served as the basis of Mr. Hagy's "engineering analysis," in which Mr. Hagy made corrections to the geographic mistakes in Mr. Santiago's CDRs. In his corrections, Mr. Hagy assumed that the cell sites and radio numbers were accurate in the CDRs and used the 2003 Index to examine whether a switch was actually connected to a particular cell site and radio. Mr. Hagy testified that he relied on his experience managing Cingular's network and his personal knowledge of the cell site locations in adjusting the CDRs. Mr. Hagy concluded that if he modified the Switch 3 calls (northern Maryland) to Switch 2 calls (southern Maryland), the cell sites, radio numbers, and switches would be consistent. By adjusting the Switch 3 calls to Switch 2 calls, the combination of switch, cell site, and radio channel numbers positioned Mr. Santiago in the vicinity of where Ms. Taylor's body was found on the night of June 13, 2003. More specifically, the CDRs modified by Mr. Hagy showed that between 5:00 p.m. and 6:30

9

p.m. that day, nine phone calls were made to or from Mr. Santiago's phone which all connected to cell sites near where Ms. Taylor's body was eventually found.

At the second trial in 2006, Mr. Hagy stated that he had the 2003 Index with him while testifying though the 2003 Index was not introduced into evidence. At this trial, defense counsel did not seek to obtain a copy of the 2003 Index.[1] Mr. Hagy destroyed the 2003 Index sometime after the 2006 trial but prior to the 2015 trial. Before Mr. Santiago's third trial in 2015 commenced, Mr. Santiago moved to exclude Mr. Hagy's testimony and "any evidence or argument that purport[ed] to alter" Mr. Santiago's CDRs on the basis that the 2003 Index was no longer available. Mr. Santiago argued that Mr. Hagy's testimony did not contain a "sufficient factual basis to be helpful to a jury" because Mr. Hagy did not publish his "engineering analysis" and Mr. Hagy lacked the ability to reproduce the analysis and testing that was the crux of the 2003 Index. Additionally, Mr. Santiago argued that Mr. Hagy's methodology was not a reliable basis for expert testimony.

In response, the State contended that there was an adequate factual basis for Mr. Hagy's expert testimony even though the 2003 Index had been destroyed. The State proffered that Mr. Hagy would testify about his methodology regarding the CDRs, the "data dump," and how Cingular had utilized databases and channel lists similar to the one Mr. Hagy produced. As an example of this point, the prosecution provided a channel list spreadsheet from 2001 that Mr. Hagy had previously created. The State argued that the

---

[1] The circuit court in the 2015 trial found that "prior counsel" "fail[ed]/refus[ed] to ask for a copy" of the 2003 Index.

fact that the 2003 Index was unavailable affected the weight, not the admissibility, of Mr. Hagy's testimony:

> [A]gain, when you look at the call detail records, as the defense wants to stand in and of themselves and on their own, they don't work. If they want to put an expert up there to say they work, that's fine. They can certainly do that. If they want to challenge [Mr. Hagy] as to why it is he is changing the records, that's fine. They can certainly do that. And, they can bring up the fact that the database doesn't exist. They can bring up all of that in cross-examination. . . . We did not seek to exclude their cellular expert. He is perfectly entitled to testify as to the records as he sees them, and as to the issues he potentially sees with [Mr. Hagy's] analysis. That's going to go before the jury. And, ultimately, it's a matter of weight for [the jury] in terms of what it is that they're going to do with [Mr. Hagy's testimony], and how they're going to interpret it.

The trial court asked the State to provide additional information about how and why the 2003 Index had been destroyed. The State asserted that between 2006 and 2015, the 2003 Index had been destroyed during the ordinary course of Cingular's business,[2] which included the removal of Mr. Hagy's computers and paper files.

The trial court ruled in favor of Mr. Santiago finding that although the State had not acted in bad faith and that Mr. Santiago's prior defense team had an opportunity to receive a copy of the 2003 Index during the 2006 trial, the 2003 Index was essential to Mr. Hagy's testimony. The trial court specifically stated that allowing Mr. Hagy's testimony would "not [be] fair to the defense." After this ruling, the State filed a motion for reconsideration of the trial court's decision. In support of its motion, the State asked Mr. Hagy to testify

---

[2] Mr. Hagy testified that Cingular, due to being a technology company undergoing many network changes during the years between 2006 and 2015, disposed of obsolete software on a frequent basis.

11

about his engineering analysis and the corrections to Mr. Santiago's CDRs. The State argued, regarding expert opinion under Rule 5–702, that

> the bar for the factual basis that is necessary for an expert to testify is quite frankly very low. You can use almost anything as I said. You can use inadmissible hearsay. You can use admissible hearsay. Opinions of others in certain circumstances. . . . But we're not even going that far here. Everything that [Mr. Hagy] had testified to today would be admissible. And that forms a factual basis for his testimony.

The trial court vacated its prior ruling and concluded that Mr. Hagy's expert testimony was admissible. In its explanation, the trial court determined that the question surrounding Mr. Hagy's testimony was a question of "weight not its admissibility."

Following his convictions in the third trial, Mr. Santiago appealed to the Court of Special Appeals. In an unreported opinion, the Court of Special Appeals found that Mr. Hagy's "substantial experience" and "specialized knowledge," combined with "a logical reasoning process" to compare Mr. Santiago's CDRs with independent analysis clearly demonstrated that there was a sufficient factual basis for Mr. Hagy's expert opinion testimony. *Santiago*, 2017 WL 347604, at *9. As such, the Court of Special Appeals affirmed the trial court's decision on reconsideration regarding Mr. Hagy's testimony. *Id.* at *15.

### ii. *Analysis*

This Court has held that "the admissibility of expert testimony is a matter largely within the discretion of the trial court, and its action in admitting or excluding such testimony will *seldom* constitute a ground for reversal." *Roy v. Dackman*, 445 Md. 23, 38–39 (2015) (quoting *Bryant v. State*, 393 Md. 196, 203 (2006)) (emphasis added) (internal

quotation marks omitted).  Further elaborating, this Court explained that "[i]n exercising the wide discretion vested in the trial courts concerning the admissibility of expert testimony, a critical test is whether the expert's opinion will aid the trier of fact." *Bryant*, 393 Md. at 203–04 (quoting *Rollins v. State*, 392 Md. 455, 499–500 (2006)) (internal quotation marks omitted).  We note that in our recent decision in *Johnson*, the Court discussed how cell phone records contain "a string of data unfamiliar to a lay person . . . [which is] not decipherable based on personal experience."  *Johnson v. State*, No. 6, September Term, 2017, slip op. at 22 (Feb. 21, 2018) (quoting *Payne*, 440 Md. at 701).  A circuit court's decision to allow an expert witness to testify will be reversed only if the trial judge acted in an "arbitrary or capricious manner" or if the trial judge's decision was "beyond the letter or reason of law."  *Garg v. Garg*, 393 Md. 225, 238 (2006) (quoting *Jenkins v. State*, 375 Md. 284, 295–96 (2003)) (internal quotation marks omitted).

In deciding whether to admit expert testimony, the trial court "shall determine (1) whether the witness is qualified as an expert by knowledge, skill, experience, training, or education, (2) the appropriateness of the expert testimony on the particular subject, and (3) whether a sufficient factual basis exists to support the expert testimony."  Md. Rule 5–702. Both parties in the present matter focus exclusively on the last prong of Maryland Rule 5–702—whether Mr. Hagy possessed "a sufficient factual basis" for his testimony regarding Mr. Santiago's phone records.

When analyzing whether expert testimony is based on "a sufficient factual basis," we consider whether the prospective testimony is comprised of (a) an adequate supply of data, and (b) a reliable methodology.  *Dackman*, 445 Md. at 42–43 (quoting *CSX Transp.,*

*Inc. v. Miller*, 159 Md. App. 123, 189 (2004)) (internal quotation marks omitted). For expert testimony to be admissible, it must "constitute 'more than mere speculation or conjecture'" and "indicate the use of reliable principles and methodology in support of the expert's conclusions." *Rochkind v. Stevenson*, 454 Md. 277, 286 (2017) (quoting *Exxon Mobil Corp. v. Ford*, 433 Md. 426, 478 (2013)). Data from sources such as an "expert's first-hand knowledge, facts obtained from the testimony of others, and facts related to an expert through the use of hypothetical questions," has been found to constitute "a sufficient factual basis." *Taylor v. Fishkind*, 207 Md. App. 121, 143 (2012) (citing *Sippio v. State*, 350 Md. 633, 653 (1998)). To satisfy the requirement of "reliable methodology," "an expert opinion must provide a sound reasoning process for inducing its conclusion from the factual data and must have an adequate theory or rational explanation of how the factual data led to the expert's conclusion." *Ford*, 433 Md. at 481 (citation and internal quotation marks omitted).

Mr. Santiago argues that the trial court's ruling erroneously admitted expert testimony from Mr. Hagy that located Mr. Santiago's cellular phone calls on the night of June 13, 2003 near the scene of the crime. Mr. Santiago contends that there was an insufficient factual basis for Mr. Hagy's expert opinion, under Maryland Rule 5–702, because his analysis relied on a "speculative assumption" that the switches in Mr. Santiago's CDRs were incorrect while the radio channel numbers were correct and because his analysis was "based on his untestable assertions about the content of the destroyed [2003 Index]." In support, Mr. Santiago points to Mr. Hagy's admission at trial that, "if the radio channel information were incorrect," Mr. Hagy's "entire analysis goes out the

14

window." Mr. Santiago maintains that the court's alleged abuse of discretion was not harmless beyond a reasonable doubt given that the State had conceded in its motion for reconsideration that exclusion of Mr. Hagy's expert testimony would "gut the State's case."

The State responds that the trial court soundly exercised its discretion when it found that a sufficient factual basis existed in admitting Mr. Hagy's expert testimony. Specifically, the State contends that the destruction of the 2003 Index did not deprive Mr. Hagy's testimony of a sufficient factual basis.

We agree with the trial court and the Court of Special Appeals and find that a sufficient factual basis existed for Mr. Hagy's expert opinion testimony. At the time of his testimony, Mr. Hagy had worked as a radio network engineer for Cingular for an extensive period and it was his responsibility to resolve technological issues for the company. Because of his daily experience with Cingular's network, Mr. Hagy obtained particularized knowledge about how cell sites and cellular phones interact with cellular signals, especially in the Mid-Atlantic region. Mr. Hagy's knowledge and experience were what led him to recognize that Mr. Santiago's CDRs produced geographical impossibilities that could not be accurate and that the switch numbers, which were subject to technological error due to rehoming, were most likely the reason for this discrepancy. Being able to spot technological inconsistencies and correct them was Mr. Hagy's job. By using a logical reasoning process in comparing Mr. Santiago's CDRs to a database that Mr. Hagy produced and updated as part of his day-to-day job managing Cingular's network, Mr. Hagy was able to deduce that calls designated as being made in the Switch 3 area in fact were made in the Switch 2 area.

15

Mr. Santiago spends a significant portion of his brief focusing on Mr. Hagy's testimony that if the channel information were incorrect, his analysis would be flawed. It is the responsibility of a reviewing court to verify that an expert witness had a sufficient factual basis to formulate an opinion. It is the responsibility of the fact finder to determine whether an expert witness's assertion should be believed. *Sessoms v. State*, 357 Md. 274, 293 (2000) (citing *Great Coastal Express, Inc. v. Schruefer*, 34 Md. App. 706, 725 (1977)) (explaining that the fact finder "may believe or disbelieve, credit or disregard, any evidence introduced, and a reviewing court may not decide on appeal how much weight must be given to each item of evidence"). Simply because Mr. Hagy's analysis could be incorrect if the radio channel numbers were in fact wrong does not suggest that Mr. Hagy's analysis that the switches were the source of the problem was "unsupported" or that Mr. Hagy failed to have a sufficient factual basis for making such a determination. As discussed previously, Mr. Hagy understandably focused on the switches when he realized that the CDRs contained geographically impossible numbers. He personally knew from his work experience at Cingular that the calls in question were made at a time when Cingular was reconfiguring its network, which caused technological inaccuracies. Mr. Hagy testified that the radio channel number was the most specific piece of identifying data for each call entry, and the switch number was the least specific. Therefore, it logically follows for Mr. Hagy to have begun his analysis by testing the accuracy of the broadest data point. In addition, Mr. Hagy validated calls listed in the CDRs which were not routed through Switch 3 to ensure that they also were accurate according to the 2003 Index. Mr. Santiago and his expert witness, who also testified about the cellular location of Mr. Santiago on the

16

night of Ms. Taylor's disappearance, were permitted to highlight that Mr. Hagy had to assume the accuracy of the radio channel and cell site numbers as part of his analysis. The trial court correctly summarized the question of Mr. Hagy's testimony as one pertaining to "weight not its admissibility." Mr. Hagy's analysis was far from "speculation" and the trial court's decision to admit the testimony was not an abuse of discretion.

Mr. Santiago's second argument, that Mr. Hagy's engineering analysis lacked a sufficient factual basis because it was "based on his untestable assertions about the content of the destroyed [] 2003 [Index]," also fails. In *U.S. Gypsum Co. v. Mayor of Baltimore*, we stated that we saw "no reason to adopt a rule that expert scientific testimony and a scientific report can never be admissible unless the opponents have been furnished with the raw data on which the testimony and report are based." 336 Md. 145, 172 (1994). In *Gypsum*, a defendant attempted to exclude an expert's testimony because the defendant "did not have access to any of the underlying data contained in the [expert's] study." *Id.* at 170. We rejected this argument because the Court was unaware of any cases "in this State or elsewhere, holding inadmissible expert testimony based on scientific research on the ground that the other side did not have access to the data underlying the research." *Id.* at 172. We concluded by stating that the defendant's "asserted lack of access to the data goes only to the weight the jury might give to [the expert's] study and to [the expert's] testimony rather than to admissibility of such evidence." *Id.* at 173.

Like the expert in *Gypsum*, Mr. Hagy's testimony was admissible. The absence of the 2003 Index at the third trial, while unfortunate, was merely a factor for the jury to weigh

17

regarding the believability of Mr. Hagy's testimony rather than a question of admissibility which was noted by the trial court in this case. As stated in Maryland Rule 5–703

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

As stated previously, information from an "expert's first-hand knowledge, facts obtained from the testimony of others, and facts related to an expert through the use of hypothetical questions," has been found to constitute "a sufficient factual basis" and satisfy the requirements of Maryland Rule 5–703. *Fishkind*, 207 Md. App. at 143 (citing *Sippio*, 350 Md. at 653).

Mr. Hagy explained that the 2003 Index was compiled using a process he frequently used when confronted with technological inconsistencies to correct and augment Cingular's network. Because of his lengthy experience creating these documents for the Mid-Atlantic region, Mr. Hagy had specific, personal knowledge of the facts he relied upon even if he could not independently recall at the third trial in 2015 the specific switch, cell site, and radio assignments found in the 2003 Index. As such, the absence of the 2003 Index did not render Mr. Hagy's testimony inadmissible. Additionally, the trial court's decision to admit Mr. Hagy's testimony was not made in an "arbitrary" or "capricious" manner as shown by the trial court's deliberate, thorough conclusion.

## B. *Mr. Santiago's Silence*

### i. *The State Farm Investigation*

On June 14, 2003, Mr. Santiago made a claim with State Farm, his automobile

18

insurance company, that his Jeep Cherokee automobile had been stolen. State Farm's records indicated that the claim was ultimately denied due to Mr. Santiago's failure in both "comply[ing] with the conditions of the policy requiring the assistance and cooperation of the insured in submitting to an examination under oath" and "providing material documents and information." State Farm's records also indicated that there were questions as to "concealment and material misrepresentation . . . following the loss" and "whether the cause and origin of the loss was accidental."

Prior to his third trial, Mr. Santiago filed a motion in limine arguing that the State should be precluded from introducing the State Farm records into evidence because the introduction of the records would violate Mr. Santiago's Fifth Amendment right against self-incrimination. The trial court held a hearing on Mr. Santiago's motion. The State advanced the theory that Mr. Santiago set his automobile on fire in an attempt to destroy and conceal evidence related to Ms. Taylor's disappearance. As such, the prosecution argued to the trial court that the State Farm records were relevant in showing Mr. Santiago's consciousness of guilt. The prosecution specifically argued that "[t]here was never an invocation of any Fifth Amendment privilege . . . . Mr. [] Santiago simply did not cooperate" with State Farm's investigation. The State continued, stating that "there is no indication of a Fifth Amendment privilege and there is no police involvement . . . . No one forced or compelled [Mr. Santiago], which is what the Fifth Amendment is about, to make the insurance claim." The hearing court concluded that "there was no indication that [Mr. Santiago] was compelled to make any self-incriminating statements, and the Fifth Amendment only protects against compelled self-incrimination. [Mr. Santiago]

19

affirmatively made a claim. . . . [N]o one has tried to force him to testify." The trial court further determined that the State Farm records were "highly relevant, and [the records are] probative to show consciousness of guilt . . . . [T]he prejudice is not outweighed by the probative value."

Mr. Santiago argues that the Court of Special Appeals erred in holding that the trial court properly admitted evidence of Mr. Santiago's silence during State Farm's investigation that was related to and concurrent with the police investigation of this case on the basis that the evidence was probative of consciousness of guilt. Mr. Santiago states that his silence during the investigation could have been for several reasons which were not probative of consciousness of guilt and that this case parallels the pre-arrest silence cases that he cites.

The State responds that the trial court was correct in admitting the evidence because the State Farm records were probative of Mr. Santiago's consciousness of guilt and were therefore relevant. The State argues that Mr. Santiago's attempt to compare his case with pre-arrest silence cases does not succeed because there was no police involvement when Mr. Santiago made a voluntary claim against State Farm or when Mr. Santiago terminated communication with State Farm's claim investigation.

    ii.    *Analysis*

In "weighing the relevancy of evidence[,]" trial judges "generally have 'wide discretion[.]'" *State v. Simms*, 420 Md. 705, 724 (2011) (quoting *Young v. State*, 370 Md. 686, 720 (2002)). A trial judge does "not have discretion to admit irrelevant evidence."

20

*Id.* (citing *Pearson v. State*, 182 Md. 1, 13 (1943)). In reviewing a trial court's decision to admit or exclude evidence on the basis of relevance, an appellate court must consider

> first, whether the evidence is legally relevant, and, if relevant, then whether the evidence is inadmissible because its probative value is outweighed by the danger of unfair prejudice, or other countervailing concerns as outlined in Maryland Rule 5-403. During the first consideration, we test for legal error, while the second consideration requires review of the trial judge's discretionary weighing and is thus tested for abuse of discretion.

*Id.* at 725 (citations omitted).

Mr. Santiago argues specifically that *Weitzel v. State*, 384 Md. 451 (2004) and *Snyder v. State*, 361 Md. 580 (2000) support the argument that his silence should not have been admitted because "[a]n individual who is aware that he is a suspect in an ongoing criminal investigation may have innocent reasons for remaining silent when he reasonably believes his statements will be communicated to law enforcement." We disagree with his assertion.

In *Weitzel*, we held that "pre-arrest silence in police presence is not admissible as substantive evidence of guilt under Maryland evidence law" because "the evidence is too ambiguous to be probative." 384 Md. at 456, 461. The Court based its conclusion upon the unique interactions police officers have with suspects. *See id.* at 460 (noting that "silence is the natural reaction of many people in the presence of law enforcement officers"). Additionally, we stated that "[w]hile silence in the presence of an accuser or non-threatening bystanders may indeed signify acquiescence in the truth of the accusation, a defendant's reticence in police presence is ambiguous at best." *Id.* at 461. As the State persuasively argues, there was no police involvement at any stage of Mr. Santiago's initial

21

insurance claim or during State Farm's subsequent investigation. State Farm's involvement and investigation only began due to Mr. Santiago's voluntary action of filing a claim. As such, this Court finds State Farm's position in this case more similar to that of a "non-threatening bystander[]" rather than any type of "police presence." *See id.*

In *Snyder*, the prosecution attempted to infer consciousness of guilt due to a suspect's "failure to inquire about the progress of the police investigation into his wife's murder." 361 Md. at 596. We held that the defendant's failure to "inquire about the status of the investigation" was "too ambiguous and equivocal to support" such an inference. *Id.* Among other factors, we considered whether the suspect "was requested by the authorities to inquire regularly and certainly" or if the suspect "voluntarily stated that he would regularly inquire." *Id.* After concluding that no evidence existed that the suspect was "requested by the authorities to inquire regularly and certainly" about the investigation or that the suspect affirmatively stated to police that he would "regularly inquire" about the investigation, we held that there was no basis for an inference of consciousness of guilt. *Id.*

Unlike the police investigation in *Snyder*, the investigation in Mr. Santiago's case was conducted by State Farm, had no police involvement, and was voluntarily begun by Mr. Santiago's claim filing. Additionally, Mr. Santiago's insurance policy with State Farm required that he cooperate in the claim investigation process. Mr. Santiago's attempt to conflate police involvement with voluntary activity that could potentially attract police attention is unpersuasive.

Maryland Rule 5–403 states:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

The State Farm records confirmed that Mr. Santiago filed a stolen vehicle claim for his Jeep Cherokee and subsequently did not cooperate with State Farm by refusing to give a requested examination under oath. Mr. Santiago's failure to comply with the terms of his State Farm policy tended to show that Mr. Santiago knew he had submitted a fictitious stolen vehicle claim. Mr. Santiago's voluntary action was probative of consciousness of guilt, the evidence cannot be considered to be unfairly prejudicial, and the probative value of this evidence is not substantially outweighed by the danger of unfair prejudice. *Cf. Martin v. State*, 364 Md. 692, 706–07 (2001). Therefore, we find no clear abuse of discretion in the trial court's ruling to admit evidence of Mr. Santiago's silence during the State Farm insurance investigation.

## CONCLUSION

In summary, we hold that the trial court did not err in finding a sufficient factual basis to admit testimony from the State's cellular communication expert, Mr. Hagy. In addition, we hold that the trial court did not err in admitting evidence of Mr. Santiago's silence during an investigation by his automobile insurer that was related to and concurrent with the police investigation in this case. Accordingly, we affirm the judgment of the Court of Special Appeals.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED.**

23

**COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY PETITIONER.**